463 So.2d 1342 (1984)
Ronald Wayne EFFERSON
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF TRANSPORTATION & DEVELOPMENT.
Dale A. LEBLANC
v.
STATE of Louisiana, etc.
Charles W. STEVENS
v.
STATE of Louisiana, etc.
Nos. 83 CA 1155 to 83 CA 1157.
Court of Appeal of Louisiana, First Circuit.
November 29, 1984.
Rehearing Denied December 28, 1984.
Writs Denied March 8, 1985.
*1345 Charles W. Borde, Jr., Denham Springs, for plaintiffs Ronald Wayne Efferson and Dale A. LeBlanc.
A. Wayne Stewart, Denham Springs, for plaintiff Charles W. Stevens.
Jerry L. Finley, Baton Rouge, for the defendant State of La., through Dept. of Transp. & Development.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
The State of Louisiana, through the Department of Transportation and Development (DOTD) appeals the judgments against it in these consolidated cases. Ronald Wayne Efferson, Dale A. LeBlanc, and Charles W. Stevens were injured when a pickup truck driven by Stevens left Louisiana Highway 1032 in Denham Springs, Louisiana, and struck two trees. Efferson and LeBlanc brought suit against Stevens and the State of Louisiana through the Department of Development and Transportation (DOTD). Stevens brought suit against DOTD. Efferson and LeBlanc settled with Stevens and his insurer and executed releases which reserved all rights against any other parties which might be liable. After trial, the trial court found the DOTD solely responsible and awarded judgment in the principal amounts of $321,981.11 for Efferson, $793,908.81 for Le-Blanc, and $44,300.00 for Stevens. The DOTD has suspensively appealed these judgments.
The undisputed facts are as follows:
On October 14, 1980, at approximately 9:00 p.m., plaintiffs were involved in an accident on Louisiana 1032, also known as the River Road, located in Denham Springs. The accident involved only the pickup truck driven by Stevens and owned by his father. As the vehicle traveled south, it failed to negotiate a left curve in the road, ran off the road, struck one tree in the outside of the curve with its right rear fender, traveled a short distance farther, and struck another tree head-on. The truck was demolished and serious injuries were sustained by all three plaintiffs. It was established at trial that Stevens had consumed some alcohol in the form of hard liquor and beer during the late afternoon and evening before the accident; that he had also eaten a meal earlier in the evening; that the approach to the curve had been marked by a reverse curve sign and a 15 mile per hour advisory 333 feet before the beginning of the curve; that a 40 mile per hour regulatory sign had been placed between the curve advisory and the curve, approximately 200 feet from the curve; that a driver's view of the curve advisory on approach beyond 100 feet may have been somewhat obscured by tree limbs; that there were no skidmarks on the roadway; that there was an undetermined number of small black and white curve delineator signs erected on the shoulder both just before and at the curve.
The trial court found the DOTD liable to the plaintiffs under both theories of negligence *1346 and strict liability, finding that the State was negligent in that it (1) installed an improper curve sign for this curve; (2) placed the curve sign too close to the curve itself; (3) placed a 40 miles per hour speed limit sign between the curve and speed advisory signs and the curve itself; (4) improperly maintained the curve delineation markers in the curve itself; (5) installed the wrong type of delineation markers in the curve; (6) allowed trees to grow and remain too close to the paved portion of the highway on the outside of the curve; (7) improperly maintained the shoulder of the roadways in the accident area "allowing a drop-off to exist in excess of one inch"; and (8) failed to remove tree limbs which obscured the curve advisory sign. The court stated that it felt that "all of these acts of negligence of the defendant were the sole and proximate cause of the accident which is the subject of this lawsuit." The court went on to set up the elements of the plaintiff's burden of proof under the strict liability theory of La.C.C. art. 2317 and concluded:
This court feels that the plaintiffs have met this burden of proof. The highway was in the care and custody of the defendant, State of Louisiana, through the Department of Transportation and Development, as stated herein above, this Court found that the roadway, shoulders, signs and road right of way were defective, this Court feels that these defects occassioned (sic) an unreasonable risk of injury and that these defects were the cause-in-fact of the plaintiffs' injuries and damages, all as concluded by the plaintiffs' expert witnesses also.
The court also stated specifically that it "does not find any negligence or victim fault on behalf of any of the plaintiffs in this case," stating that even if it found such, the DOTD would still be strictly liable since the plaintiff fault would not amount to harms caused by (1) "fault of the victim," (2) "`sole' fault of third party," or (3) "irresistable force."
After reviewing the entire record, we find that the facts in this case lend themselves more readily to a discussion of the condition of this curve generally than to a discussion of each particular conclusion of the trial court or each assignment of error.
We note initially that the trial court's enumerated findings were used to support a finding of negligence. However, nowhere in the record was it shown that the DOTD knew or should have known of these "defects," nor was any act or omission imputable to the DOTD shown on the part of any person. Liability based upon negligence is imposed when the DOTD is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). However, in the interest of justice, we will consider these factual findings as supporting the trial court's finding of strict liability on the part of the State.
As Stevens approached the curve heading south he first encountered the reverse curve sign and the 15 mile per hour speed advisory. He stated at trial that he saw neither sign, without giving any reason for this failure. Photographs introduced at trial show that the curve advisory sign (which was posted just above the speed advisory) may have been partially obscured by tree limbs.[1] However, Duaine Evans, plaintiffs' expert witness, testified that he estimated that both signs could be seen from a distance of approximately 100 feet upon approach. The fact that Stevens did not see the sign, even though it was visible for 100 feet shows that it did not play any causative role in this accident. Only if he had seen it and acted upon its message could it be considered a cause in fact of this accident.[2]
*1347 Further, the plaintiffs' contention that the limbs obscuring the curve advisory sign lead in some way to State liability is without merit. Stevens was familiar with the road. He had gone to school in the area for twelve years. He denied driving the road often but admitted he had done so a few times and had been in cars when others had done so. He had passed the curve going north about fifteen minutes before the accident, which occurred as he was proceeding south and returning to his home. He knew the curve was there. The trial court was clearly wrong in finding that limbs partially obscuring the curve sign created an unreasonably dangerous condition which led to plaintiffs' injuries.
We also find that the trial court was clearly wrong in basing its finding of unreasonable risk in part upon the distance the curve sign was from the curve. The only evidence in the record regarding the appropriate distance from the curve for the sign to be placed was testimony regarding the standards from the Uniform Manual of Traffic Control Devices, stating that the sign should be 250 feet from the curve in urban areas and 750 feet from the curve in rural areas. However, Dr. Walton testified that 333 feet from the curve was a proper placement distance for the sign in a 40 miles per hour speed zone, given that the 250 feet standard was calculated for a 30 miles per hour zone. This curve was within the city limits of Denham Springs and near its business district, and Stevens knew where it was. The distance this sign was placed from the curve played no part in this accident.
The next sign that Stevens encountered as he approached the curve was a 40 mile per hour regulatory sign placed approximately 200 feet before the curve. Stevens testified he saw this sign and that it led him to believe that he could travel safely at a speed of 40 miles per hour. He maintains that he traveled 35 miles per hour and was forced off the road in the curve due to centrifugal force. The conclusion he advocates is that it is impossible for a vehicle to make the curve at 35 to 40 miles per hour, and that therefore the placement of that sign indicating 40 miles per hour to be a safe speed made the curve unreasonably dangerous.
The trial court agreed with Stevens. This conclusion was clear error.
At trial, Evans stated that in his opinion a person could not travel the curve safely at 35 to 40 miles per hour. He based this upon the ball-bank tests he had done which indicated that 25 miles per hour was the fastest the curve should be signed. He even went so far as to state that he would not attempt to test it at 40 miles per hour. He stated, "I did drive it at 35, but of course, I was under test conditions, I knew what I was approaching and I was in the daytime...." (Emphasis added.) The trial court apparently relied upon this testimony in concluding that the curve could not be safely negotiated at 35 to 40 miles per hour. After reviewing the entire record, we find that this reliance constituted clear error in several respects.
First, Stevens had driven through the curve in a northerly direction just minutes before the accident. It was not the first time he had driven around this curve, and he admitted that he had been a passenger in vehicles traveling this curve before. He further admitted in his deposition that he "knew it was ahead." The trial court was manifestly erroneous in relying upon Evans' testimony to support a finding that Stevens could not have negotiated the curve. Evans' testimony supported only an inference that the curve might be dangerous for the driver unfamiliar with the road. Since Stevens was familiar with the road, Evans' testimony does not support a finding that the curve could not be handled by Stevens.
Furthermore, Evans was the only person (other than the three plaintiffs) at trial who thought the curve could not be negotiated *1348 at 35 miles per hour. Ned Walton, defendant's expert, stated that he drove it safely at 40 miles per hour and was of the opinion that a driver could maintain control of his car if he left the road at the point the plaintiffs' truck did going a speed of 35 or 40 miles per hour. Maurice Jordan, the State's maintenance engineer, stated that he had traveled around the curve safely going 45 miles per hour. Dale Mills, the officer who investigated the accident, stated that he had driven the curve at 35 to 40 miles per hour with no trouble at all. Joe Sanchez, Mills' partner, also noted that 35 to 40 miles per hour was a safe speed.
In addition, Evans appears to have based his conclusion upon the ball-bank tests he conducted. However, Walton was uncontradicted when he testified, in his capacity as an expert, that the ball-bank test is not used to indicate a safe road speed from an engineering standpoint but merely indicates the maximum speed a driver may take the road without experiencing an uncomfortable degree of centrifugal pull within the passenger compartment of his car. He stated that the curve could be safely driven at 35 miles per hour, a speed faster than that which might be indicated by a ball-bank test as the comfortable speed.
Our second reason for finding the trial court's reliance upon Evans' testimony to be clear error is that it failed to realize that Evans further qualified his testimony, stating that he was able to drive the curve safely at 35 miles per hour partly because he was driving during the daytime. He also testified that regardless of the presence of the 40 miles per hour sign, "weather and traffic would be the two factors that would force [Stevens] to not travel at that speed...." The inference supported is that the reasonably prudent driver who knows the curve is ahead and is traveling in less than optimal weather conditions (which we deem must include the darkness of nightfall) slows to a speed below the posted legal limit. Stevens should have so adjusted his speed if the fact that he was driving at night was going to give him a problem negotiating the curve.
We find, therefore, that the trial court was clearly wrong in concluding the curve could not be handled by Stevens at 35 miles per hour. The great weight of the evidence was that it could be driven at that speed; further, Evans so qualified his testimony that it did not support the finding of an unreasonable risk of harm to Stevens who was aware that the curve was ahead.
The trial court found that the position, maintenance, and types of curve delineators present at the accident site contributed to the unreasonably dangerous condition of the curve. We note that there was no evidence presented as to how many curve delineators were in place, or their condition, before the accident. All of the testimony was based upon the observations of the witnesses that some of the delineators had been knocked down, but it was never established when those delineators had been destroyed.
The trial court found that the road was structurally defective in that it had (1) a one-inch shoulder drop from the pavement, (2) an excessive shoulder slope from the pavement to a point approximately eight to nine feet from the pavement to the trees, and (3) trees that were too close to the road. The only testimony regarding any difference in the height of the pavement and the shoulder was given by Evans. He stated that he found a three-inch to five-inch drop-off from the pavement to the shoulder; however, he stated that the spots he marked were clearly well beyond any point in the road which had anything to do with this accident. There was no other evidence pointing to any difference in the level of the shoulder and the pavement whatsoever, and Officer Mills testified that upon checking for some discrepancy he found none. We further note that the photographs entered at trial show a perfectly level pavement and shoulder at the point where the truck left the road. The trial court was clearly wrong in this conclusion.
Upon examining all the evidence, however, we find that we cannot say the trial court was clearly wrong in concluding that the combination of the proximity of the *1349 trees to the road with the severe slope of the outer part of the shoulder constituted an unreasonably dangerous condition in this roadway. The plaintiffs all testified that it was only shortly after the truck left the road that it hit the first tree. The experts also testified that the drop on the outside of the shoulder was severe, up to eleven inches at some points, and that this drop occurred right at the base of the trees.
One may recover against the State on the basis of strict liability under La.C.C. art. 2317 by showing (1) that the thing which caused the damage was in the care or custody of the defendant, (2) that it had a vice or defect, i.e., some condition which occasioned an unreasonable risk of injury, and (3) that the injury was caused by the defect. Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980). This shoulder had (1) a severe outer slope which an inadvertent driver leaving the roadway might have significant trouble with when attempting to return to the roadway, and (2) trees which were approximately nine feet from the paved portion of the road and posed a formidable obstacle for the inadvertent driver who found himself bearing down upon them. These shoulder conditions were defects which created an unreasonable risk of harm to straying motorists.
The DOTD has a duty to see that the highways are reasonably safe for persons exercising ordinary care and reasonable prudence. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Everett v. Louisiana Department of Transportation and Development, 424 So.2d 336 (La.App. 1st Cir.1982). Included within this duty is the maintenance of the shoulders of the highways in a reasonably safe condition. Rue v. State Department of Highways, 372 So.2d 1197 (La.1979).
The court in Sinitiere stated that the DOTD is not a guarantor of the safety of travelers, but owes a duty under traditional negligence theory to keep the highways and shoulders reasonably safe for non-negligent motorists. Before this duty can be applied to the facts in this case, however, two questions must be answered:
(1) Does the duty as formulated under Sinitiere, a case decided under traditional negligence theory, apply to this case being decided under La.C.C. art. 2317 strict liability; and
(2) To whom is this duty owed?

APPLICATION OF THE SINITIERE STANDARD IN STRICT LIABILITY.
The court in Sinitiere, 391 So.2d at 825, noted in footnote 3 that it was not deciding the applicability of La.C.C. art. 2317 to the facts it faced. However, as this court noted in Buchanan v. Tangipahoa Parish Police Jury, 426 So.2d 720, 724 (La.App. 1st Cir.1983):
In Kent [v. Gulf States Utilities Co., 418 So.2d 493 (La.1982)], the court observed that the only difference between the strict liability and negligence theories of recovery was the element of the defendant's scienter. Under the negligence rule, it must be shown that defendants either knew or should have known of the risk, whereas under strict liability the claimant is relieved only of proving that the defendant knew or should have known of the risk. In either case, the claimant must still prove an unreasonable risk of harm that resulted in damage. While the basis for determining the existenceof the duty is different between strict liability and negligence,the duty which arises is the same.
(Underscoring added.)
We find, therefore, that we have no trouble applying the duty imposed in Sinitiere in a strict liability case.

THE AMBIT OF THE DUTY
Although the statements of the duty in Sinitiere do not clearly state whether the duty is owed only to the "non-negligent" motorist or to some larger group of potential plaintiffs, that court's handling of the duty owed the negligent driver Lavergne appears to answer our question. After discussing the development of the duty through prior jurisprudence the court stated that "the plaintiff's decedents in the Sinitiere-Henry suit, as well as Lavergne, *1350 are within the ambit of the Department's duty to maintain reasonably safe highway shoulders." (Emphasis added.) After discussing the negligence of the DOTD, the court held that "the Department must also be said to have breached its duty to Mr. Lavergne since he was within the scope of the Department's duty." Sinitiere, 391 So.2d at 825.
We conclude that when the Sinitiere court wrote that the DOTD "owes a duty to keep the highways and its shoulders reasonably safe for non-negligent motorists" (emphasis added) it did not mean to restrict the duty as being owed only to the non-negligent motorist. Therefore, the DOTD in this case breached its duty to Stevens.
However, we have yet to fully answer the question of the cause of this accident. Indeed, the shoulder sloping into the trees did play a causal role in the injuries received by all three plaintiffs. However, our treatment of the trial court's reasons requires us to delve farther into the record to determine why this accident happened.

STEVENS' NEGLIGENCE
The trial court was clearly wrong in failing to take into account the copious evidence which showed that Stevens was negligent in several respects in his operation of the vehicle. More particularly, Stevens was negligent in that he failed to see[3] the 15 miles per hour advisory sign, even though it was visible for a distance of at least 100 feet.
The evidence clearly established also that Stevens had been drinking earlier in the evening. The only testimony as to the quantity of alcohol consumed by Stevens was the self-serving testimony of the three plaintiffs that he consumed approximately two ounces of liquor and one beer. However, a blood test taken at the hospital several hours after the accident showed his blood-alcohol level to be .06. Dr. James Freeman was accepted as an expert in clinical pathology, and on the effects of alcohol on human conduct. His uncontradicted testimony was that, given a normal rate of breakdown for a man of Stevens' weight, at the time of the accident his blood-alcohol level would have been .092. Dr. Freeman further testified that this alcohol content would have impaired his physical function somewhat.
We also find that the record supports the conclusion that Stevens was driving at an excessive speed when entering the curve. The extensive damage which occurred to the vehicle indicated a speed of greater than 40 miles per hour when it left the highway. The truck traveled over 87 feet before hitting the first tree with its right rear fender, then another 65 feet before hitting the second tree head-on. The photographs introduced at trial show the front end of the truck to be demolished. After making these observations, Officer Mills concluded and indicated in his accident report that Stevens had been speeding.
That Stevens' driving was the primary cause of this accident, and not any defective condition of the roadway, is further supported by the fact that Efferson stated to Officer Mills at the scene that Stevens "lost control" of the truck. Furthermore, none of the three plaintiffs remembered anything unusual happening before the truck left the shoulder and struck the tree. When we consider plaintiffs' testimony with Walton's, that the person inside a vehicle which was leaving the road due to centrifugal force would feel "seat of the pants friction" inside the truck long before the centrifugal force would be sufficient to move the truck off the road, we conclude that centrifugal force actually had nothing to do with this truck leaving the *1351 road. Both Officer Mills' and Stevens' testimony established that the truck left the road just past the last driveway at the start of the curve. At most, the fault attributable to the State was the severe slope of the shoulder and proximity of the trees, conditions which may not have permitted a driver to steer back onto the highway easily once the vehicle left the pavement. However, the primary cause of this accident was Stevens' driving at an excessive rate of speed and his failure to see the warning signs erected by DOTD. Dr. Freeman's testimony indicates that Stevens' perception was impaired by alcohol. This, too, was probably a contributing cause of the accident.
In conclusion, we find that Stevens was contributorily negligent in causing his own damages, and as to plaintiffs Efferson and LeBlanc, was a third party concurrently negligent with the DOTD. His negligent fault contributed significantly to, but was not the sole cause of this accident, which was also significantly, but not solely, caused by some fault on the part of the DOTD for which it is strictly liable.

APPORTIONMENT OF LIABILITY UNDER COMPARATIVE NEGLIGENCE
La.C.C. art. 2323 was amended by Acts 1979, No. 431, § 1, to introduce the concept of comparative negligence into our law. It provides for the apportionment of fault between the defendant and the plaintiff and reduction of the plaintiff's damage award in proportion to that apportionment "when contributory negligence is applicable to a claim for damages ..." In Dorry v. LaFleur, 399 So.2d 559 (La.1981), the court found that where the activity for which the defendant was strictly liable was neither ultrahazardous nor unnatural to the locality, and produced no income to the defendant, that there was no policy reason to deny the defendant the defense of contributory negligence. Dorry, 399 So.2d at 561. In Morgan v. Hartford Accident and Indemnity Company, 402 So.2d 640 (La. 1981), the court noted at page 643, note 3, that "[t]he question of whether contributory negligence can serve as a defense in a strict liability case has recently been considered by this Court in Dorry ... and answered affirmatively in a plurality opinion...." After considering this jurisprudence as well as the similar jurisprudence of this circuit,[4] we conclude that contributory negligence is available generally as a defense in a strict liability case, subject to the specific exceptions created in Dorry and others which may be created by the courts in the future.
Initially, we note that the trial court found no negligence on the part of Stevens. Whether the plaintiff was contributorily negligent presents a question of law when it is a part of the inquiry as to the extent of a defendant's duty under a duty/risk analysis. Varnado v. Continental Ins. Co., 446 So.2d 1343 (La.App. 1st Cir.1984). If the scope of the duty owed by defendant does not wholly embrace or exclude protection of the plaintiff from the risk of harm caused in part by his own negligence, then the question of apportionment of fault under our comparative scheme is properly presented. See Johnson, Comparative Negligence and the Duty-Risk Analysis, 40 La.L.Rev. 319, 332 (1980). However, the question of the percentage of fault to be allocated a party under comparative negligence is a question of fact. See e.g., La.C.C.P. art. 1812(C). *1352 The appellate court has review of facts in Louisiana. La. Const. art. V, § 10(B); La. C.C.P. art. 2164. The court should, in the interest of judicial economy, evaluate all the evidence to make a determination of fact based upon the complete record before it rather than remand to the trial court. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Therefore, after reviewing the entire record, we find that we are able to justly determine the percentages of fault attributable to the DOTD and Stevens. Borrowing from the appropriate standard for appellate review of damages, we note that since the trial court clearly found the State was 100% at fault in this case, and mindful of the great degree of negligence we find on the part of the plaintiff Stevens, we reduce the percentage of fault attributable to the State to the highest degree of fault a reasonable finder of fact could have found, and raise the percentage of fault attributable to the plaintiff Stevens to the lowest percentage a reasonable finder of fact could have found. We find that the appropriate percentages are 20% fault on the part of the State and 80% fault on the part of Stevens. His claim for damages is not thereby defeated, but is reduced in proportion to his degree of negligence.

THIRD PARTY FAULT OF STEVENS AS IT AFFECTS THE CLAIMS OF EFFERSON AND LEBLANC
The latest definitive pronouncement by the Louisiana Supreme Court on the applicability of the defense of third party fault to a strict liability claim is found in Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1979), which states that "[T]he fault of a `single person' which exonerates a person from his own obligation importing strict liability as imposed by Articles 2317, 2321 and 2322 is that which is the sole cause of the damage." Olsen, 365 So.2d at 1293. However, our Civil Code, after the legislative adoption of comparative negligence in Acts 1979, No. 431, requires our consideration of both the fault of Stevens and the DOTD in apportioning the damages due Efferson and LeBlanc.[5]
Our inquiry as to the application of third-party fault under a comparative negligence scheme begins not with article 2323 but with article 2324. "Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido...." As to plaintiffs Efferson and LeBlanc, this sentence of article 2324 clearly makes Stevens and the DOTD solidary obligors for the damage those two plaintiffs incurred.[6]
The second part of that paragraph provides a narrow exception to the general rules of solidary liability which have been invoked by the use in the article of the words "in solido." That exception is not applicable to plaintiffs Efferson and Le-Blanc since, as judgment creditors, neither has any degree of negligence whatsoever under our particular facts.
Referring to the Code articles on solidary liability, we find that under article 2091 debtors obliged to do the same thing are obligated in solido and each may be compelled for the whole. Indeed, this is what Efferson and LeBlanc have attempted to do against the DOTD as they have released Stevens. However, under article 2100, a creditor who consents to division of the debt with regard to one of the co-debtors still has an action in solido against the other co-debtors, but must first deduct the part of the debtor whom he has discharged. Billeaudeau v. Lemoine, 386 So.2d 1359 (La.1980); Canter v. Koehring Co., 283 So.2d 716 (La.1973). These cases, decided before La.Acts 1979, No. 431, held that release of one of the solidarily bound joint tort-feasors was considered a division of the debt, and required that a deduction be made of the released tort-feasor's share from the obligation owed by the others. Article 2103 determined that his "share" *1353 under 2100 meant his virile, or equal, portion. Billeaudeau, 386 So.2d at 1361; Canter, 283 So.2d at 727-8. However, article 2103 was amended with the adoption of comparative negligence specifically to reapportion liability among solidary tort-feasors from virile shares based upon equal division among the debtors to a division based upon the "proportion [of] each debtor's fault." Therefore, we apply the Billeaudeau/Canter analysis to articles 2100 and 2103 as amended and find that the effect of releasing Stevens is to discharge the liability of the DOTD, the remaining solidary co-debtor, to the degree of Stevens' fault.[7] We therefore reduce the damage awards to Efferson and LeBlanc against the DOTD by 80%, the proportion of fault attributable to Stevens.

DAMAGES
DOTD complains that the awards given plaintiffs were excessive. Plaintiffs have not answered the appeal to complain of inadequacy.
A. As to Dale LeBlanc, the trial court's reasons provided:
I find that Mr. LeBlanc suffered severe and permanent injuries as a result of this accident, including, but not limited to, a broken neck, rendering him totally disabled based upon his education, experience, and inability to read and write. I do find that he suffered extreme pain and discomfort from the date of this accident until the date of this trial and I find he will continue to suffer pain and discomfort as a result of his injuries.

Lost wages from the date of accident
 until trial date................... $ 14,817.00
Loss of future wages................. $247,937.00
Hospital, doctor and related bills... $ 11,154.81
Injuries, past pain and suffering.... $400,000.00
Scars and Disfigurement.............. $ 20,000.00
Future pain and suffering............ $100,000.00
 ___________
 TOTAL............................... $793,908.81

Our examination of the record confirms the very serious and permanent nature of LeBlanc's injuries. Dr. Patricio Mujica estimated his permanent disability at 35-40% of the body as a whole and that it was probably progressive. Dr. Mujica felt that LeBlanc was physically incapable of little other than "intellectual work;" however, LeBlanc has only a minimal education. The trial court did not abuse its great discretion in its award to LeBlanc.
B. As to Ronald Wayne Efferson, the trial court's reasons provided:
I find that Mr. Efferson suffered severe and permanent injuries as a result of this accident, including, but not limited to, fractured femora in both legs, broken left ankle, broken left arm and lacerations. I find that he suffered severe pain and discomfort due to his many broken bones, hospital stays and surgeries. I find that he has been disabled to work in the past since the accident and will continue to suffer extreme pain and discomfort and will be disabled in the future in the range of 10%-20% in each leg, causing him to miss work on many future occasions. In addition, Mr. Efferson will have to undergo future surgery for the removal of a pin in his hip and will incur expenses and pain and suffering.

Lost wages from the date of accident
 until trial date................... $ 4,678.40
Loss of future wages................ $ 50,000.00
Hospital, doctors and related
 expenses .......................... $ 4,302.71
Injuries, past pain and suffering... $200,000.00
Future medical expenses............. $ 3,000.00
Scars and disfigurement ............ $ 10,000.00
Future pain and suffering........... $ 50,000.00
 ___________
 TOTAL.............................. $321,981.11

Efferson was also seriously and permanently injured in this accident. Dr. Andrew Kucharchuk estimated a 5-10% disability in both legs, probably progressive as he ages, resulting from calcification caused by the insertion of rods in each hip. He was of the opinion that prolonged sitting would cause a great deal of discomfort because of the calcium deposits. He also felt that the rod which still remains in Efferson's right leg should be removed soon.
*1354 The trial court awarded Efferson $50,000.00 for loss of future wages. There is no evidence in the record that he will ever be disabled from pursuing gainful employment. He is a well motivated, hard working individual who has returned to work and is able to put in a day's work without significant problems of any kind. We must reduce the award to Efferson by $50,000.00. We also note that the overall award was very generous, but we are not prepared to find that it was an abuse of the trial court's great discretion.
C. As to Charles W. Stevens, the trial court's reasons provided:
I find that Mr. Stevens suffered severe injuries, pain and suffering and should be awarded the following damages:

Specials, doctors, hospital and
 related bills..................... $ 4,300.00
General damages, pain and suffering
 and injuries...................... $40,000.00
 __________
TOTAL............................... $44,300.00

Stevens sustained a comminuted fracture of the shaft of the right ulna which required surgery and internal fixation with a metal plate and screws. The hardware remains in place and causes problems. He also suffered a fracture to the medial malleolus of his left ankle. Dr. Richard Bolton, an orthopedic surgeon, treated him for these fractures. Bolton estimated the healing period for Stevens' arm to be three to four months and two months for the ankle. If the plate is removed, Bolton testified he would be hospitalized for two days and Bolton's fee would be $250.00. Bolton did not see Stevens after October 11, 1980.
Dr. Millard Byrd, Jr., also treated Stevens in the hospital for a lacerated liver which he felt healed within three to four weeks without any problems. Dr. Byrd did not see him after he left the hospital.
The award of general damages is extremely generous, but we will not say it was an abuse of the trial court's great discretion. Reck v. Stevens, 373 So.2d 498 (La.1979).

DECREE
For the reasons set forth herein, the judgments of the trial court against the DOTD are amended, awarding the amounts as follows:
1. To Dale A. LeBlanc, the sum of $158,781.76, together with legal interest thereon from date of judicial demand until paid.
2. To Ronald Wayne Efferson, the sum of $64,396.22, together with legal interest thereon from date of judicial demand until paid.
3. To Charles W. Stevens, the sum of $8,860.00, together with legal interest thereon from date of judicial demand until paid.
All costs of these proceedings are taxed 80% to Stevens and 20% to the DOTD.
AFFIRMED IN PART, REVERSED IN PART, AND AMENDED.
NOTES
[1] These photographs cannot be relied upon as proof that the limbs obscured Stevens' view of the curve advisory sign. Counsel for all parties stipulated at the start of trial that although all the photos to be entered accurately depicted the scene, they "were not taken to show ... necessarily what a driver would see."
[2] The court accepted plaintiffs' allegation that the reverse curve sign was an improper sign and that the reverse turn sign should have been erected. It also accepted Evans' testimony that according to his tests the proper speed advisory sign would have been one saying 25 miles per hour rather than 15 miles per hour. Despite the fact that this latter point is favorable to the State in that it shows an overabundance of caution, the fact that Stevens failed to the see these signs, even though they were visible, obviates the need for us to discuss with particularity these findings of the court.
[3] If Stevens' testimony that he did not see the sign was incorrect, then his conduct was substandard in seeing the sign and ignoring it in favor of the 40 miles per hour sign. The reasonably prudent man faced with a curve advisory and speed advisory sign followed shortly by a 40 miles per hour sign before he encounters the curve does not ignore the former speed advisory and assume that he can take the curve at 40 miles per hour. We cannot accept Evans' statement that a driver would ignore the advisory because "it's a lot smaller than the regulatory sign, which means it has less significance, generally speaking."
[4] See, e.g., Buchanan v. Tangipahoa Parish Police Jury, 426 So.2d 720 (La.App. 1st Cir.1983) and cases cited therein. The excellent discussion in Buchanan spotlights the policy reason mitigating against allowing contributory negligence to be synonymous with victim fault as a defense in strict liability cases. Strict liability, at its inception at the common law, was a means of distributing the risk of injury for ultrahazardous activities among those who conducted the activity, and were (not coincidentally) the ones most able to pay. The contributory negligence of a plaintiff, however, was held to justify barring his recovery. To allow contributory negligence to be applied in defense by a strictly liable defendant undermined the strong social policy behind strict liability, especially in the usual case where there was undeniably some negligence on the part of plaintiff, but not enough to justify barring recovery. The comparative negligence scheme, of course, sidesteps this problem, barring recovery by the plaintiff only to the extent of the damage he caused himself.
[5] See Narcise v. III. Cent. Gulf Railroad Co., 427 So.2d 1192, 1196 (La.1983), at note 5, where the Supreme Court stated "[t]he legislative adoption of a comparative fault system ... requires that the fault of all parties be quantified...."
[6] The plaintiff Stevens was made a third party defendant in these suits as per La.C.C. art. 2103.
[7] This analysis and result is consistent with that to be reached under the revised (1984) Civil Code articles on Obligations. See article 1803 and Official Revision Comment (b); article 1804.