| THIBODEAUX, Judge.
The defendant, Pecot and Associates Rehabilitation and Physical Therapy Services, Inc., appeals a" judgment awarding $327,649.84 to the plaintiff, Richard James Pontiff, in this negligence suit. After a nonjury trial, the trial court concluded that the defendant negligently rendered substandard postoperative physical therapy care to Mr. Pontiff.
We affirm.
I.

ISSUES

We shall address the following issues:
(1)whether the trial court erred in denying defendant’s Motion for New Trial on the issue of future lost wages where plaintiff failed to carry his burden of proof and failed to present any medical evidence indicating with reasonable certainty that the plaintiff has a residual disability causally related to the incident at issue;
(2) whether the trial court erred in finding that the conduct of the defendant fell below the standard of care required of physical therapists in 1993; and,
(3) whether the trial court erred in finding that plaintiff carried his burden of proof to show that defendant’s conduct was causally related to plaintiffs injury.
II.

FACTS

Mr. Pontiff had a herniated interverte-bral disc at T5-6. In January of 1993, he began experiencing pain in the middle of his thoracic region radiating at times to the right anterior thigh and occasionally to the right inguinal region. He was Preferred to Dr. Luiz C. deAraujo, a neurological surgeon, by his attending internist, Dr. N.C. Boudreaux. On March 15, 1993, he was examined by Dr. deAraujo. Dr. deAraujo recommended Mr. Pontiff undergo a thoracic microdiscectomy by a transthoracic approach. On April 8, 1993, Mr. Pontiff underwent the microdiscecto-my. Prior to this surgery, Dr. Charles Boustany, a cardiothoracic surgeon, performed a right thoracotomy in order that Dr. deAraujo would have access to the spine. During the thoracotomy, Dr. Bous-tany opened Mr. Pontiffs chest, collapsed his lung, and separated the lung and major vessels from the spine so that Dr. deArau-jo would be able to approach the spine in order to perform the microdiscectomy. The latissimus dorsi muscle was divided and then sutured together during the procedure. According to Drs. Boustany and deAraujo, the surgery was successful.
On April 19, during his examination of Mr. Pontiff, Dr. deAraujo noted that Mr. Pontiff was recovering well and experiencing only some mild operative site pain. He found that the thoracotomy wound was well healed and removed the surgical sta- *481 pies. Dr. deAraujo then prescribed physical therapy for Mr. Pontiff. Dr. deArau-jo’s physical therapy prescription called for the following: a PT to the thoracic area and the lumbosacral spine five times a week for eight weeks; ultrasound; ice and hot packs; fluoromethane spray; pool therapy; swimming programs; and ROM,streteh-Ex. Dr. deAraujo testified in his deposition that “ROM,stretch-Ex” was to be interpreted as range of motion and stretching exercises.
Mr. Pontiff began physical therapy with Pecot and Associates Rehabilitation and Physical Therapy Services, Inc. (Pecot and Associates) on May 11, 1993. During his first visit, Mary Pecot conducted an initial evaluation of Mr. Pontiff. She noted that his chief complaint was pain in the thoracic area of the scar Land along the medial scapular border. She noted tenderness along the medial border and moderate muscle spasm on the right side. She used this information and the prescription in formulating Mr. Pontiffs treatment plan. Kim Morris, a physical therapy assistant, supervised most of his therapy. Mr. Pontiff’s therapy with Pecot and Associates initially consisted of the application of ice packs, a heat pack, ultrasound, warm-up exercises and pool therapy. Within the first month, Ms. Pecot introduced resistance exercises into Mr. Pontiffs therapy. This included resistive training on the Hydra-Fitness machine, a type of hydraulic resistive equipment. This training allows a particular muscle to be exercised concentrically in both directions. The particular machine used by Mr. Pontiff was the butterfly machine, a strength training machine. He began working out on the butterfly machine on June 16.
On June 24, Ms. Pecot added the aerobic bike to his therapy. Mr. Pontiff was instructed to ride for a half-mile circuit and then to use the resistive machines immediately following his aerobic training on the bicycle. He stated that while he was using the butterfly machine, he felt something “pop” in his right flank which caused his right side to “blow out.” Dr. deAraujo examined him on Juné 30 and noted a clear spasm of the muscle. Dr. deAraujo advised rest and referred him to Dr. Steven J. Snatic, a neurosurgeon, for additional consultation. Dr. Snatic stated in his letter to Dr. deAraujo of August 10, 1993, that Mr. Pontiff reported experiencing a burning pain along the thoracic scar at the time of the “pop” on June 24, and had continued to experience pain along the thoracic spine, in the area of the incision, and in his lower back. Mr. Pontiff also claimed to feel pulling sensations and pain along the scar, tingling of the buttocks, and occasional pain along his right lateral thigh. Dr. Boustany examined him on July 15, 1993. During this exam, he found a separation on the suture line of the latissimus muscle which had been sutured during surgery. _]iáAt the time of the examination he was uncertain as to whether the muscle was completely dehisced, or separated. He did, however, think that Mr. Pontiff probably had torn away some of the muscle along the suture line. He initially prescribed rest to see if the muscle would heal on its own. However, on September 8, 1993, he reexamined Mr. Pontiff and found that the latissimus dorsi muscle had separated and was partially torn. Dr. Bousta-ny performed another surgery to repair the muscle. He reopened the thoracotomy incision and recut the latissimus muscle. He recut the serratus which was detached away from the chest wall. The muscle layers were then reapproximated using a number 1 Vicryl suture.
In spite of the surgery, Mr. Pontiffs pain continued to worsen. On March 17, 1994, he filed a petition for damages against Pecot and Associates and Ms. Morris. Mr. Pontiff alleged Pecot and Associates had been negligent in failing to properly train, supervise, and monitor its employees such as Ms. Morris, and that Pecot and Associates was otherwise negligent. With respect to Ms. Morris, Mr. Pontiff alleged that she had failed to exercise the degree of care and skill ordinarily *482 exercised by physical therapists, that she had failed to heed his protests that he could not perform the physical therapy treatments she was supervising, that she had failed to stop performing physical therapy treatments once he began to complain that he was in pain, and that she had been otherwise negligent.
In early 1995, Dr. Mark Warner, Ph.D., assistant professor of clinical psychology in the Louisiana State University Medical Center, found he was suffering from depression due to chronic pain following the injury. Dr. Warner referred him to Coping Skills Development, Inc., a program of pain management. Mr. Pontiff began therapy for his chronic pain with Dr. Jimmie D. Cole, Ph.D., on June 29, 1995.
IsA trial was held in October, 1999. The court awarded Mr. Pontiff the stipulated amount of $17,649.84 for medical expenses, past loss of wages in the amount of $125,000.00, future loss of wages in the amount of $100,000.00, and general damages in the amount of $85,000.00. In its written reasons for judgment of December 6, 1999, the court declined to find former Pecot and Associates employee, Ms. Morris, responsible because the testimony indicated that she acted on the instruction of her employer, Ms. Pecot, and had no authority to devise or alter therapy sessions.
Pecot and Associates filed a motion for a new trial on the issue of future lost wages. The hearing was held on April 19, 2000, and the motion was denied. Pecot and Associates then filed this appeal.
III.

LAW AND ARGUMENT

The Standard of Review
The reviewing court is required to give great weight to the factual conclusions of the trial court. Linzay v. Haas Inv. Co., Inc., 576 So.2d 1178 (La.App. 3 Cir.1991). Manifest error is the standard used by appellate courts to resolve conflicting factual evidence. Ambrose v. New Orleans Police Dep’t Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. This means that if a reasonable factual basis exists for the trial court’s findings, they should not be disturbed by the appellate court in the absence of manifest error. Linzay, 576 So.2d 1178. A court of appeal may set aside a trial court’s or a jury’s finding of fact if it finds that there was manifest error or if the decision was clearly wrong. Mistich v. Volkswagen of Germany, Inc., 95 0939 (La.1/29/96), 666 So.2d 1073; Rosell v. ESCO, 549 So.2d 840 (La.1989), on remand, 558 So.2d 1360 (La.App. 4 Cir.), writ denied, 561 So.2d 105 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), unit denied, 374 So.2d 660 (La.1979). If the findings by the trial court or jury are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if it is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State, Through Dep’t of Transp. & Dev., 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991), on remand, 597 So.2d 71 (La.App. 4 Cir.1992), writ denied, 600 So.2d 646 (La.1992). For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder’s conclusions were reasonable. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305. Thus, where there is a conflict in the testimony, the trial court’s reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even if the appellate court may feel that its own evaluations and inferences are as reasonable. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985).
Standard of Care
Mr. Pontiff alleges he felt the muscle tear while he was exercising on the butterfly machine, a resistive exercise machine. If Ms. Pecot impermissibly introduced the butterfly machine into Mr. Pontiffs therapy, then this constitutes a deviation from *483 the standard of care of physical therapists. Both Mr. Pontiff and Ms. Pecot offered expert testimony as to the standard of care regarding a physical therapist. Mr. Pontiffs expert, Patricia Boulet, is a licensed practicing physical therapist in New Iberia. Ms. Boulet testified to several areas of Ms. Pecot’s treatment of Mr. Pontiff that she felt fell below the requisite standard of care. Firstly, she |7testified that Ms. Pecot deviated from the standard of care of physical therapists by introducing a type of exercise that, according to her, was not prescribed by the treating physician. She stated that Ms. Pecot had added resistive or strengthening exercises to Mr. Pontiffs therapy and that these were not a part of Dr. deAraujo’s prescription. The portion of the prescription at issue was for “ROM,streteh-Ex.” Dr. deAraujo testified that he had intended this to signify “range of motion and stretching exercises.” Ms. Boulet’s interpretation of the prescription followed that of Dr. deAraujo’s. Ms. Pecot, however, interpreted this to mean “range of motion, stretching, and exercises.”
Resistive exercises are those which exert pressure on the movement of the musculature. Ms. Boulet testified that, in her opinion, the resistive exercises that were introduced into Mr. Pontiffs therapy were an impermissible deviation from the prescription. Ms. Pecot, on the other hand, argued that resistive exercises were implicitly part of the prescription, even if her interpretation of the prescription was not reasonable, because swimming is a type of resistive exercise and swimming exercises had been included in the prescription.
Under Louisiana law, a physical therapist may not treat a patient without a written physical therapy prescription. The Physical Therapists’ Code of Ethics, Principle 3.4 states that “[a]ny alteration of a program or extension of services beyond the program should be undertaken in consultation with the referring practitioner.” Because resistive exercises were not set forth in the original prescription, Ms. Boulet stated that consultation with Dr. deAraujo was necessary before Mr. Pontiff could be advanced to that level. Thus, according to Ms. Boulet, Ms. Pecot did not have the latitude or the discretion to introduce either circuit training or the butterfly machine into Mr. Pontiffs therapy. Nor did Ms. Pecot have the authority to change a | ^treatment plan prescribed by Dr. deAr-aujo or any other physician. Only in the case where a physician has indicated on the prescription that the therapist is to “evaluate and treat” would the therapist have such discretion. There was no such indication on the prescription written by Dr. deAraujo.
Virginia Davis, a physical therapist in private practice and Ms. Pecot’s expert witness, testified that Ms. Pecot’s interpretation of the prescription was consistent with the treatment she prescribed. She stated that the program that Ms. Pecot designed for Mr. Pontiff was “consistent with how she interpreted the prescription for therapy that the physician wrote.” Thus, the resistive exercises were not inappropriate based on how Ms. Pecot interpreted the prescription. However, Ms. Davis did not at any time state that Ms. Pecot’s interpretation was a reasonable .one. In fact, Ms. Davis herself would not have interpreted the prescription in the manner that Ms. Pecot did; instead, she agreed with Dr. deAraujo and with Mr. Pontiffs witness. Ms. Davis testified only that Ms. Pecot’s introduction of resistive exercises was reasonable based on her interpretation of the prescription.
The prescription reads as follows: “ROM, stretch-Ex.” Here, “ROM,” or “range of motion,” is used as an adjectival phrase and should be followed by a noun. However, if we read the prescription as Ms. Pecot did, “range of motion” has no noun to modify. If we read it as Ms. Boulet and Dr. deAraujo said it should be read, “ROM” modifies the “Ex” or exercises. Further, whereas there is a comma following “ROM,” there is no comma following “stretch.” Thus, the three words *484 do not signify three different and distinct items as Ms. Pecot claims but rather two different types of exercises, that is, stretching exercises and range of motion exercises. Moreover, as testimony from both of the physical therapists indicates, there is a broad spectrum of different types of exercises, including passive, active, Rand resistive, as well as stretching and strengthening. Dr. deAraujo provided great details in the rest of the prescription and did so as well here. In any case, if Ms. Pecot found the prescription to be ambiguous, she had a duty to contact the prescribing physician for clarification.
Secondly, Ms. Pecot deviated from the accepted standard of care when she failed to conduct a comprehensive initial evaluation of Mr. Pontiff. Ms. Boulet testified that a comprehensive initial evaluation of the patient should have included both a subjective evaluation of the patient’s complaints as well as objective measurements such as neurological testing, strength measurements, range of motion measurements, and any functional measurements. Such measurements were especially crucial for Mr. Pontiff because, according to Ms. Boulet, Mr. Pontiffs case was rather unique in that his herniated disc was located in an area where herniated discs are uncommonly found and therefore his type of surgery was not performed very often. According to Ms. Boulet, Mr. Pontiffs initial evaluation lacked critical information on the strength and range of motion ability of his trunk for trunk rotation. She stated that she would have expected at a minimum to find range of motion measurements to be taken of the lumbar spine, thoracic spine, and shoulder girdle. Secondly, she would have expected strength measurements of the rotator cuff, lumbar extensors and lumbar flexors. She stated that some flexibility testing was done for trunk flexion but that there was no chart entry for information on the rotator cuff or upper extremity in terms of range of motion. Also, there was no information on initial strength testing.
Ms. Davis, Ms. Pecot’s witness, on the other hand, noted that the Physical Therapy Practice Act in effect in 1993 was not as specific as later revisions to the code with regard to the types of information that would be required in an initial | ^evaluation. However, Ms. Davis also stated that she herself would have included more documentation of information about Mr. Pontiffs condition at the initial evaluation, especially that pertaining to the upper extremity. Further, she admitted that certain measurements were missing from Ms. Pecot’s evaluation. Specifically, Ms. Davis stated that she would have liked to have seen more information related to Mr. Pontiffs strength and range of motion in the upper extremity. Ms. Pecot admitted that she should have recorded information on the range of motion and strength of his upper extremities but argued that the fact that it was not in the record did not mean that it was not done.
Such information is vital to the practice of physical therapy because the therapist bases his or her plan of care on the prescription and the results of the initial evaluation. Thus, thorough evaluation of a patient’s capabilities is crucial in order to avoid injury to the patient. Although the Practice Act in effect at the time was not specific as to the type of information to be recorded in an initial evaluation, information crucial to a particular injury should have been recorded. Therefore, Ms. Pe-cot’s failure to conduct a comprehensive initial evaluation was a deviation from the accepted standard of care.
Thirdly, Ms. Pecot deviated from the standard of care in that she failed to communicate with Dr. deAraujo, a violation of the Practice Act in effect in 1993. The Practice Act provides that the conclusions of the initial physical therapy evaluation or consultation “shall be reported to the referring or treating physician.” La.R.S. 37:2401(l)(d) (1993). There was no such communication whatsoever following the initial examination. Nor did Ms. Pecot transmit any information on Mr. Pontiffs *485 progression to Dr. deAraujo during the course of treatment. Ms. Pecot admitted that she should have communicated with Dr. deAraujo. It is likely that had In Ms. Pecot communicated with Dr. deAraujo either following the initial evaluation or at some point during her treatment, resistive exercises never would have been introduced into Mr. Pontiffs therapy and the injury would not have occurred.
Burden of Proof
This is not a case of medical malpractice because the conduct of physical therapists is not within the purview of the Louisiana Medical Malpractice Act. It is a case of ordinary negligence. Louisiana law provides that “[ejvery act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” La.Civ.Code art. 2815. In determining whether a plaintiff may recover damages under this article, courts traditionally employ a duty-risk analysis, which asks the following: (1) whether the conduct in question was a eause-in-fact of the resulting harm; (2) if the defendant owed a duty to the plaintiff; (3) if that duty was breached; and (4) whether the risk and the harm caused were within the scope of protection afforded by the duty breached. E.P. v. City of Lafayette, 98-802 (La.App. 3 Cir. 12/9/98), 722 So.2d 1182, writ denied, 99-0086 (La.3/12/99), 739 So.2d 204.
In personal injury cases, there is a rebuttable presumption that a disability resulted from an accident if certain factors are present. Specifically, the accident is presumed to be the cause of the disability
if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Lucas v. Insurance Co. of N. Am., 342 So.2d 591, 596 (La.1977).
L/To overcome this presumption of causation, the defendant must show that some other particular incident could have caused the injury in question. Iorio v. Grossie, 94-846 (La.App. 3 Cir. 10/4/95), 663 So.2d 366; Sudduth v. State, Dep’t of Transp. & Dev., 619 So.2d 618 (La.App. 3 Cir.1993).
Mr. Pontiff testified that on June 24, 1993, either Ms. Pecot or her assistant, Ms. Morris, decided to change and increase the difficulty of his resistive exercises. Ms. Pecot admitted that she did not perform any special testing prior to this because she had been monitoring his progress on a daily basis and knew he was ready for the routine. On that date he felt or heard a “pop” while he was working out on the butterfly machine. Following this “pop” he experienced significant pain and was unable to continue exercising. Shortly thereafter, he sought medical attention from Dr. deAraujo and Dr. Boustany. They discovered that the muscles that Dr. Boustany had cut and sewn back together had separated. Dr. Boustany performed surgery to repair them. He was ordered to rest and three months later began seeing another physical therapist. He claims to have been in pain since the time of the incident on June 24,1993.
Prior to this “pop,” Mr. Pontiff had been experiencing an excellent recovery and had no pain, other than a slight amount at the site of the incision. Nor did Dr. Boustany find that Mr. Pontiffs continuing pain was related to post-thoracotomy syndrome, a condition which arises from the surgery itself. In post-thoracotomy syndrome, individuals generally experience pain from the time of'surgery. Dr. Boustany testified that during the second surgery he did not enter the thoracic cavity, spread the ribs, or exert pressure on the intercostal nerve. Thus, in his opinion the continuing pain did not arise from the surgery to repair the injury but rather from the injury itself. This pain then did not subside. Nor did Dr. Boustany |iathink that post-thoracotomy syndrome could have arisen *486 from the second surgery when he repaired the torn muscle.
There was a conflict in the testimony over what occurred on June 24, 1993, at Pecot and Associates. Mr. Pontiff testified that upon experiencing the pain in his right side, he stopped exercising and told Ms. Morris. He stated that she told him to rest for a minute and then asked him to continue working out, which he did, while experiencing pain. He further testified that he returned to Pecot and Associates the following day and informed Ms. Pecot of his injury. Ms. Morris and Ms. Pecot, on the other hand, testified that they did not recall Mr. Pontiff making any complaints of pain or injury on the day of the incident. Ms. Morris admitted, however, that although Mr. Pontiff returned on two subsequent occasions, he never worked out on the butterfly machine again. Further, on June 25, the day following the incident, the records indicated that Mr. Pontiff was “very sore” and his therapy consisted only of ice packs, hot packs, ultrasound and a massage.
Ms. Pecot attempted to overcome the presumption that the incident on June 24 caused the injury by arguing that Mr. Pontiffs fishing was the cause of his injury on June 24. She argued that it arose or could have arisen from his fishing on June 15 or earlier. However, her own notes indicate that this is not likely the case. The records indicate that on June 16 Mr. Pontiff was experiencing soreness on his left side, which he attributed to his fishing the day before. On June 17, according to the records, the pain had cleared up and his strength and range of motion were good. Ms. Pecot’s notes indicated the same thing on June 22, 23 and 24, and he continued performing his exercises. Then on June 25, following the increase in his resistive exercises, and the day after Mr. Pontiff claims the injury occurred, Ms. Pe-cot’s own |14records indicate no exercises were given because he was in pain. Instead, only a massage and hot and cold packs were used.
It is clear that Ms. Pecot, as a licensed physical therapist, owed a duty to Mr. Pontiff, her client. Ms. Pecot’s duty is defined by the standard of care of similar physical therapists and the Association of Physical Therapists of America. We find that the trial court was correct in its determination that Mr. Pontiff presented sufficient evidence to show that this duty was breached and that Ms. Pecot’s care fell below the standard of other physical therapists.
Future Lost Wages
Much discretion is accorded the judge or jury in the assessment of damages. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993). Upon appellate review, an award will be disturbed only when there has been a clear abuse óf that discretion. Id. Only if an articulated analysis of the facts discloses an abuse of discretion may the appellate court determine that an award is either excessive or insufficient. Reck v. Stevens, 373 So.2d 498 (La.1979).
An award for the loss of future income is inherently speculative. Callihan v. Town of Vinton, 95-665 (La.App. 3 Cir. 12/6/95), 668 So.2d 735. In determining a future loss of income, a trial court must consider the plaintiffs physical condition before and after his injury, his past work record and the consistency thereof, the amount he probably would have earned absent the injury, and the probability that he would have continued to earn wages over the balance of his working life. Odom v. Claiborne Elec. Co-op., Inc., 623 So.2d 217 (La.App. 2 Cir.), writ denied, 629 So.2d 1171 (La.1993).
|1sMs. Pecot argues that the trial court erred in finding Mr. Pontiff carried his burden of proof on the issue of loss of future income because she alleges that he failed to present any medical evidence that proved that he was disabled as a result of the injury. That is, Ms. Pecot argues that Mr. Pontiff must present medical evidence that indicates with reasonable certainty *487 that he has a residual disability causally related to the injury and that he failed to do so.
Evidence of the plaintiffs inability to work must be presented to the court. See Broussard v. Romero, 96-973 (La.App. 3 Cir. 2/26/97); 691 So.2d 1265, writ denied, 97-0670 (La.4/25/97), 692 So.2d 1092; Aisole v. Dean, 574 So.2d 1248 (La.1991). A plaintiff must present evidence that shows his disability either prevents him from working, or reduces his income earning capacity, in order to receive damages for loss of future income. In order to obtain an award for future loss of wages and/or loss of earning capacity a plaintiff “must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident.” Aisole, 574 So.2d at 1252. An award of damages for future loss of wages requires that the plaintiff produce evidence that he will be disabled in the future from pursuing gainful employment. See Efferson v. State, Through Dep’t of Transp. & Dev., 463 So.2d 1342 (La.App. 1 Cir.1984), iurits denied, 465 So.2d 722 (La.1985). In the past, we have denied damages for loss of future wages in a case where there was no medical testimony demonstrating that the plaintiff was disabled. Broussard, 691 So.2d 1265. In Broussard, the only evidence of the plaintiffs disability was from her own testimony and that of her husband and her daughter. Id. We stated there that “[without more, we cannot conclude that Mrs. Broussard is unemployable due to the injuries she sustained.” Broussard, 691 So.2d at 1273.
|1fiIn her motion for a new trial and in her appeal, Ms. Pecot argued that there is a bright line requirement for a medical doctor’s determination that a plaintiff suffers from a disability preventing employment in order to show proof of future earnings loss. Mr. Pontiff argued that medical evidence showing proof of disability is not a prerequisite for future loss of income. In support, he cites our holding in Maddox where we held that “[a] claim for loss of earnings need not be proven with mathematical certainty, but only by such proof as reasonably establishes plaintiffs claim. This may consist only of plaintiffs testimony if considered credible by the trier of fact.” Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5, 7 (La.App. 3 Cir.1991). The trial court agreed with Mr. Pontiff and found that he had shown sufficient proof of future loss of earnings in the absence of medical testimony to show he could not work.
In this ease, the trial court reached the correct holding for the wrong reasons. Mr. Pontiff has misinterpreted the law of Maddox. When we stated that a plaintiffs testimony alone, if credible, may be sufficient to establish a loss of earnings, we were referring only to the evidence showing the earnings loss itself, not to the evidence showing disability and inability to work. Medical testimony that a plaintiff either cannot work, or has a reduced capacity to work, is essential to establishing loss of future income. A plaintiffs testimony may be sufficient evidence of loss of future earnings provided that the fact that the disability has caused an inability to work has been proven by medical testimony.
Here, the issue is whether a psychologist’s testimony may qualify as “medical” testimony. Mr. Pontiffs condition, chronic pain syndrome, is a mental health problem, with both physical and mental components. The pain caused by this condition, though perhaps not accompanied by objective symptoms, as are for |17example, broken bones' or degenerating discs, is very real and debilitating. However, because it is primarily a psychological condition, precipitated or caused by a physical condition, it is usually diagnosed by either a mental health professional, such as a psychologist, or by a physiatrist. Moreover, in this case, the medical evidence supports that Mr. Pontiff continues to suffer chronic pain syndrome and the psychological testimony complements this evidence.
*488 Although no physicians testified as to Mr. Pontiffs ability to work, he did offer the testimony of Dr. Warner. Dr. Warner testified regarding Mr. Pontiffs chronic pain condition and its effect on his daily life, including his ability to work. Dr. Warner diagnosed him as having a mood disorder and depression due to chronic pain following injury and surgery. Dr. Warner then referred him to Dr. Cole, a psychologist specializing in the treatment of chronic pain. Mr. Pontiff began seeing Dr. Cole on June 6, 1995. He noted that all of the symptoms which Mr. Pontiff described to him, for example, marked sleep disturbance, problems with interpersonal relationships, and pain increasing with activity, were typical of patients with chronic pain. Dr. Cole evaluated Mr. Pontiff using a Multi-Dimensional Pain Inventory Form. This test compares a person’s responses to norms of people who are in chronic pain versus people who have other emotional problems or are not in this category. Dr. Cole testified that the results of this test showed that Mr. Pontiff fit the norm of a chronic pain patient. He also stated that the results of a Beck Depression Inventory test showed that Mr. Pontiff was moderately to severely depressed. In Dr. Cole’s opinion, the depression was caused by the chronic pain symptoms. Dr. Cole stated that Mr. Pontiffs chronic pain was causing him to experience depression because of the extent to which the pain interfered with his life. He stated that Mr. Pontiffs pain “was interfering with his life a great deal, to the point that he was feeling rather |18useless, overwhelmed ... [with] some suicidal ideation, and was feeling very inadequate, [with] very low self esteem.” Through testing, Dr. Cole ruled out malingering and faking and found Mr. Pontiff to be very legitimate and consistent in his responses. Dr. Cole stated that Mr. Pontiff willingly took part in the course of pain management. According to Dr. Cole, by the end of the therapy, even though the amount of pain experienced by Mr. Pontiff had not changed, his depression was in the mild range, primarily because he had learned how to cope with the pain. Thus, Mr. Pontiff had done all that could be done to assist him in dealing with his chronic pain, although it persisted as before. Therefore, Dr. Cole stated that he felt Mr. Pontiff would have difficulty working full-time due to his level of pain.
Regarding the amount of future income loss, the two experts offered somewhat different estimates. Both estimated his annual income at accident date based on an average of his past income from the years 1990, 1991, and 1992. This average was determined to be $23,485.00. Dr. Douglas Womack, Ph.D., an economist, included an average annual growth rate of 3.00% and future work life of 12.23 years. He calculated future loss to be $288,173.00. This represents his estimate of the amount of income Mr. Pontiff could theoretically earn over the next 12.23 years. Thus, if this amount were claimed as future income loss, the assumption would be that he was 100% disabled and unable to earn any income whatsoever.
Another economist, Dr. Kenneth Bou-dreaux, Ph.D., based his calculations on a work life expectancy of 12.43 years. He calculated what Mr. Pontiffs income loss over 12.43 years would be using four different wage-earning possibilities: (1) if he were earning one-half of his regular pre-injury income; (2) if he were earning $7.00 an hour or $14,560.00 per year; (3) if he were earning $8.00 an hour or $16,640.00 per year; and (4) if he were earning $9.00 an hour or |19$18,720.00 per year. Dr. Bou-dreaux then gave a range of estimates of overall income loss including yearly increases of either 2.00%, 3.00%, or 4.00%. Thus, his estimates of future loss ranged from a high of $136,892.88, with Mr. Pontiff earning one-half of his salary and averaging yearly increases of 4.00%, to a low of $49,094.77, with Mr. Pontiff earning $9.00 an hour and averaging yearly increases of 2.00%. The trial judge awarded $100,000.00. This award is reasonably supported by factors cited in the economists’ reports.
*489 Louisiana Civil Code Article 2324.1 gives the trial judge much discretion in the award of damages, particularly in a situation like the present one where damages are insusceptible of precise measurement. While the trial judge did not award the full amount that was based on Mr. Pontiff being fully disabled, the court did determine that he is impaired, physically and/or psychologically, and,' as a result, is unable to work full-time. The amount of $100,000.00 is within the range of the figures that were submitted to the court. Therefore, on the issue of loss of future wages, we find that the trial court’s award was supported by the record.
IV.

CONCLUSION

For the foregoing reasons, the judgment in favor of the plaintiff-appellee, Richard Pontiff, and against defendant-appellant, Pecot and Associates Rehabilitation and Physical Therapy Services, Inc., is affirmed.
Pecot and Associates Rehabilitation and Physical Therapy Services, Inc. is ordered to pay all costs of this appeal.
AFFIRMED.