483 So.2d 1050 (1985)
Gerald J. ALLEMAN
v.
HANKS PONTIAC-GMC, INC., et al.
No. 84 CA 0757.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
Dissenting Opinion January 16, 1986.
Writ Denied March 7, 1986.
*1051 William D. Grimley, Baton Rouge, for plaintiffappellant Gerald J. Alleman.
L. Phillip Canova, Jr., Plaquemine, for defendantsappellees Hank's Pontiac GMC, Inc.
David L. Campbell, Deutsch, Derrigan & Stiles, New Orleans, for General Motors.
Before EDWARDS, COLE, LANIER, CRAIN and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This is a redhibition suit. From a judgment dismissing plaintiff's petition after a bench trial, plaintiff appeals devolutively.
Plaintiff purchased a 1982 GMC 6.2 litre diesel powered dual wheel pick-up truck, characterized variously as "one-ton" and 3500 Series, on February 26, 1982 from Hanks Pontiac-GMC, Inc. The truck was not put into service of hauling seafood, a business he engaged in with his father-in-law, until about three weeks later because an insulated "box" had to be constructed and installed on it.
Plaintiff began experiencing difficulties with the truck as soon as he put the truck into regular use hauling crawfish from Pierre Part, Louisiana, to various cities in the state. During the "pond season" for crawfish the truck was used to haul live crawfish every day from Eunice, Louisiana to Pierre Part for later distribution to various cities. The round-trip from Pierre Part so Eunice is approximately 225 miles. The average load of seafood weighed 4,000 pounds. Crawfish season is usually from December until July 4.
On April 12, 1982, plaintiff took the truck to defendant-appellee, Hanks Pontiac-GMC, Inc., hereinafter "Hanks", for service because it was necessary to add motor oil and coolant daily. Two or three quarts of oil were added daily and a coolant/water combination was added at intervals of approximately 200 miles. Hanks replaced the head gaskets and tightened the engine oil cooling line in its endeavor to stop the leaks. The odometer reading on April 12, 1982 was 3,958 miles; by that time the truck had been used approximately one month for hauling crawfish. Plaintiff was not charged for labor or materials in performing the April 12 repairs.
On four other occasions plaintiff returned to Hanks in 1982 for repairs to stop oil and coolant leaks which developed after the April 12 repairs. The dates of service and odometer readings were: April 28, 1982 (11,956); May 10, 1982 (14,185); May 25, 1982 (16,044); and June 11, 1982 (18,393). Additionally, the truck was taken to *1052 Hanks on June 25, 1982 by prior arrangement with David R. Conley, GMC's area service representative, after plaintiff made written complaint to GMC about the chronic oil and coolant leaking problems which persisted. Mr. Conley's purpose was to diagnose the problem and have it corrected. His examination revealed an oil leak at the rear of the valve cover gasket, which "could" have been indicative of a loose bolt in the valve cover. To correct the oil leak problem Mr. Conley recommended that the valve cover gasket be replaced and "make sure all the bolts were tightened properly." He believed the oil leak "could be repaired very easily." His examination also revealed "a telltale sign of a coolant leak at the rear of the head, between the head and the block", which telltale sign consisted of the presence of residue "from what could be dried coolant leaking out between the block and the head ... on the left-hand side." Mr. Conley arranged a time two weeks after the inspection-diagnosis for plaintiff to bring the truck to Hanks "to repair the oil leak and ... the coolant leak." Plaintiff did not keep the appointment. He filed suit, naming as defendants Hanks Pontiac-GMC, Inc.(Hanks) and General Motors Corp. (GMC), on July 26, 1982 for rescission (or alternatively, reduction in purchase price) and for reimbursement of purchase price, expenses occasioned by the sale, expenses incurred for preservation of the vehicle, loss of income, damages for aggravation and inconvenience, and $10,000 attorney's fees.

TRIAL COURT
In his written reasons for judgment, the Trial Judge chronicled the several service dates and the inspection-diagnosis date, specifying the odometer reading for each date recited, and found, in pertinent part, as follows:
The plaintiff has failed to show that the vehicle had a redhibitory vice.
The testimony consisted of broad, general complaints, estimates and exaggerations. Although the truck was used for business purposes, the claims were unsubstantiated by business records. The principal complaints related to loss of coolant and excessive oil use.... [T]he plaintiff made general statements that he was required to add water or coolant every two hundred miles or just about every day. Despite this fact, according to the plaintiff, the truck never overheated. It was never established what ratio of coolant to water was adequate to prevent overheating. Plaintiff never read the owner's manual and apparently was of the opinion that coolant and water were interchangeable. His testimony lacked the consistency and detailed information necessary for the Court to reach a conclusion. [Emphasis supplied by us].
"With regard to oil use, plaintiff totally failed to show excessive use. Records could easily have been kept to check on oil use but it was not done except for a two and a half month period during which time oil use was considerably less than the normal rate as testified by the manufacturer's representative.... Considering that plaintiff operated the truck with an average load at its rated capacity and occasionally far exceeded load capacity, David Conley's testimony that the weight of the load affects both oil useage and mileage has particular significance. [Emphasis on "average" by Trial Court].
The Court concludes that the oil leaks, evidence of which was found, were not shown to have been of such significance as to constitute a redhibitory vice. Compression tests to discover oil leaks resulted in a normal reading.
. . . . . .
While the Court cannot conclude that plaintiff abused the truck, he drove it for many miles sometimes with excessive loads. The trucks(sic) could not perform as well as plaintiff's larger trucks and he was dissatisfied. Obviously, he would not buy the same kind of truck again but this is not the test of a redhibitory vice.
. . . . . .
In his formal judgment dated January 24, 1984, the Trial Judge dismissed plaintiff's *1053 petition and Hanks' third party demand against General Motors Corporation (GMC).

ASSIGNMENTS OF ERROR
Plaintiff-appellant assigns as Trial Court errors its:
1. applying a standard of proof to plaintiff's case in chief which is not required by law;
2. refusing to rescind the sale or reduce the purchase price;
3. refusing to permit plaintiff to relate statements made by one of defendant's [Hanks'] employees; and
4. refusing to receive the testimony of Bill Kirkland [owner of an identical model truck with problems similar to those alleged by plaintiff].

ISSUES
The issues, as identified in plaintiff-appellant's brief, parallel the numbered assignments of error.
We initially address the dual issues: (1) whether the Trial Court required plaintiff to prove the exact cause of the problems complained of, instead of simply proving their existence by a preponderance of the evidence and (2) whether the record as a whole supports plaintiff's demand for rescission and related relief.

BURDEN OF PROOF
In Rey v. Cuccia, 298 So.2d 840 (La. 1974), the Supreme Court, per Tate, J., reiterated the long-established jurisprudential rule that if the purchaser of an item proves that the defect in the product existed before the sale was made to him and the product is not reasonably fit for its intended use, "it is sufficient that he prove the object is ... defective, without his being required to prove the exact or underlying cause for its malfunction." Id. at 843.
In Edelman Systems, Inc. v. Capital GMC, Inc., 345 So.2d 99 (La.App. 1st Cir. 1977), Writ.Den., 347 So.2d 250 (La.1977), we reversed the District Court judgment rescinding the sale of a van, holding that plaintiff failed to establish a prima facie case of a redhibitory defect. In so doing, we reasoned, in pertinent part, that:
Because the burden is on the plaintiff initially to establish a prima facie case, the failure to establish such a case defeats his cause of action. The burden does not shift to the defendant until a prima facie case has been established by the plaintiff by a preponderance of the evidence. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (La.1971). The repair invoices [which plaintiff introduced into evidence] merely establish that certain repairs were made and, as noted, were made essentially by third persons. Within the factual context of this case, fair inferences may be drawn from such repairs other than that they arose from defects in the vehicle existing at the time of the sale.... [S]ome of the repairs may have indirectly resulted from the accident in which the vehicle was involved. Other major repairs may have resulted from ordinary wear on the vehicle beyond the 12,000 mile warranty period. Still other major repairs may be attributed to improper work performed by third persons or from improper maintenance. To allow the plaintiff to establish a prima facie case on such evidence [repair invoices only] places an undue burden on the defendant who has no personal knowledge of the repairs. Further, the failure of the plaintiff to call the drivers of the truck who had firsthand knowledge of the maintenance and mechanical problems of the truck results in an unfavorable presumption. Mid City Finance Company v. Coleman, 232 So.2d 918 (La.App. 4th Cir.1970).
... [I]n some instances a prima facie case of redhibition may be established by the introduction into evidence of various repair invoices establishing the nature and cost of the work performed.... When ... reasonable inferences of equal weight may be drawn from such documentary evidence as to the cause of malfunctioning, *1054 a prima facie case is not established.... [Bracketed language ours]. 345 So.2d at 102-103.
Edelman Systems called as its only witness its field service manager who "had never driven the van and had no personal knowledge of any defects, breakdowns, or repairs necessitated by such defects or breakdowns." The repair invoices were introduced into evidence in conjunction with the testimony of the lone witness. Plaintiff rested its case at the conclusion of the testimony and defendants rested without presenting any rebuttal evidence. 345 So.2d at 101.
In Starks v. Kelly, 435 So.2d 552 (La. App. 1st Cir.1983), this Court, per Lanier, J., cogently stated the "preponderance of the evidence" standard to be as follows:
"... A preponderance of the evidence means evidence of greater weight or evidence which is more convincing than that offered in opposition to it...." p. 556.
Justice Tate, for the Court, in Rey v. Cuccia, supra, unambiguously stated the manner in which the existence of redhibitory defects may be proved, reasoning, in pertinent part, that:
The buyer may prove the existence of redhibitory defects at the time of the sale not only by direct evidence of eyewitnesses, but also by circumstantial evidence giving rise to the reasonable inference that the defect existed at the time of the sale, (citations omitted.) As stated in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155: "* * * proof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows the fact or causation sought to be proved is more probable than not."
... [E]ven where the defect appears more than three days after the sale ..., if it appears soon after the thing is put into use, a reasonable inference may arise, in the absence of other explanation or intervening cause shown, that the defect existed at the time of the sale, (citations omitted.) 298 So.2d at 843.
In this case the District Court emphasized plaintiff's failure to substantiate his claims of excessive oil and coolant loss or usage by utilizing "business records" which the Court felt "could easily have been kept" but were not except for a two and one-half month period commencing several months after institution of this litigation.
In Jordan v. Travelers Insurance Co., supra, the Supreme Court, per Tate, J., reversed our holding that plaintiff had failed to prove "with reasonable certainty" his entitlement to an award for loss of earnings and diminished earning capacity, because of his failure to "prove it be corroborative evidence such as income tax returns or employment records." Justice Tate observed that plaintiff, his wife and his employer testified regarding earnings and their testimony was not contradicted, and reasoned that the jurisprudence cited by defendant "does not provide a mechanical rule denying any recovery, whenever a plaintiff's own testimony as to his loss of earnings is not corroborated by records." 245 So.2d at 154. Therefore, the Court held that it could "find no reason to question the proof of more-probable-than-not loss of earnings so made, simply because Jordan did not introduce his income tax returns or other records to substantiate whatever loss his testimony proved." 245 So.2d at 156.
While Jordan v. Travelers Insurance Co., supra, dealt with the amount of loss of wages, both past and future, and the present case deals with the amount of oil and coolant loss or usage, the principle is the same. Plaintiff purchased the truck for use in his seafood business and Hanks was made aware of his intended use before the sale was consummated. He did not buy the vehicle to be used as a "cowboy Cadillac" or for any personal or pleasure usage. He did not buy the vehicle so he could keep detailed usage/loss records of oil and coolant to use in court to rescind the sale just in case the use of it would prove to be so inconvenient as to render it unsuitable for its intended use. To have started *1055 keeping detailed mileage logs as soon as oil and coolant usage or loss became apparent may have cast a pale of suspicion on his motivation for doing so.
In the present case, unlike Edelman Systems, Inc. v. Capital GMC, Inc., supra, plaintiff and the other persons who drove the truck on a regular basis testified regarding the necessity to add oil and coolant daily because gauges on the instrument panel indicated when either oil or coolant levels were low, thus requiring additional oil or coolant. They also testified that the truck had to be towed in to Hanks on at least three occasions between March, 1982 and June 11, 1982. Unlike Edelman, all the service performed on the truck, except a timing adjustment made by an area General Motors dealer, was done at Hanks service department. John L. Hanks, president of Hanks, who also was in charge of the service department, testified as an expert truck mechanic and explained what service was represented by the repair invoices plaintiff introduced into evidence. He admitted on cross-examination that head gaskets were replaced on April 12, 1982, the first trip to the service department, approximately one month after the truck was placed in use of hauling seafood. During three of the seven service trips, represented by repair invoices, hoses used to circulate the coolant were either replaced or tightened, or both, in Hanks' effort to stop the coolant loss. He candidly stated that "on three occasions I saw the hoses leaking" and his "physical inspection from underneath the vehicle" on June 25, 1982 revealed "a stain or a streak of where it had been leaking" coolant. Mr. Hanks also testified that while it was his opinion that the odometer reading at trial time indicated "more than normal use" he quickly qualified that opinion by stating "Of course, for his [plaintiff's] business, maybe it's not. I don't know. But it's more than normal, yes." He also stated it was not normal for the engine to be slow in starting, as plaintiff and his drivers testified was frequently the case.
David R. Conley, GM's area service representative, who had never testified as an expert in any court, either State or Federal, before this, testified as an expert automotive diagnostic technician. Although not an automotive engineer, Mr. Conley testified that GM's "engineering department has designated through testing that normal usage of an engine willconsumption of oil would be approximately one quart of oil to every four to six hundred miles." Over plaintiff's objection, Mr. Conley was permitted to testify that hauling 4,000 pounds "under constant running ... would also affect ... [oil] mileage. I guess, to me, it's common sense." He testified to having seen the telltale sign of coolant leakage, i.e., the residue, during his June 25, 1982 physical inspection of the truck. Also, Mr. Conley testified that coolant leaks are not rare in the type of vehicle plaintiff purchased, as reflected by the recall notice introduced into evidence. He testified that the engine's temperature gauge might give a false reading unless the 60/40 ratio of coolant and water is maintained and could result in overheating of the engine which would cause engine warpage and the consequent loss of coolant. Interestingly, Mr. Conley thought the boiling point of water is 120° F, or "at quite a bit lower temperature... [than does] coolant [which] boils atI believe ... about two hundred degrees."
Mr. Conley testified that Hanks' mechanics should be able to repair the oil and coolant leakage problems by "using diagnostic procedures and procedures set out in their service manuals ... if they used them properly."
Plaintiff and his two drivers also testified to a variety of other problems, among them being a tendency of the brakes to pull, an air conditioner that worked sporadically, and a radio speaker which picked up extraneous sounds from the several mechanical functions of the truck. They testified that the braking problem manifested itself only on a wet road surface; Mr. Conley test drove the truck on June 25, 1982 on a dry road surface and never detected a problem.
*1056 In requiring plaintiff to have kept a mileage log, complete with oil and coolant usage information, presumably on a contemporaneous basis, as a necessary first step in corroborating his testimony and that of his drivers as to oil and coolant leaked or used, the District Judge imposed a greater burden of proof than required by the jurisprudence and the codal articles it interprets. His error was carried forth in his conclusion that "the oil leaks, evidence of which was found, were not shown to have been of such significance as to constitute a redhibitory vice."
It is well settled law that multiple defects can collectively form the basis of a redhibitory action even if many of the defects are minor or have been repaired. Davidson v. New Roads Motor Co., Inc., 385 So.2d 319, 321 (La.App. 1st Cir.1980), writ denied, 391 So.2d 454 (La.1980), and cases cited therein.
A District Court's findings of fact may not be reversed unless they are clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Our examination of the record as a whole convinces us that the District Court committed manifest error in finding that plaintiff failed to prove the existence of a redhibitory defect at the time of the sale. There were no disinterested witnesses testifying in this case. The testimony of plaintiff, his first cousin, Vernon J. Alleman, his brother, Grady Alleman, John L. Hanks, President and Service Manager of defendant Hanks, and David R. Conley, the latter two being officers or employees of Hanks and GMC, defendant and third party defendant, respectively, show a clear pattern of oil and coolant loss through leakage. The leakage problem was such that had plaintiff known of the defect at the time he purchased the vehicle he would not have bought it. It is an understatement to say that the truck was the source of great inconvenience and aggravation to plaintiff, his cousin, and his brother, the first two having driven the truck during the 1982 crawfish season and part of the 1983 season, and Grady from April to July, 1983. The multiplicity of problems, defects, or vices which beset the truck are redhibitory vices and plaintiff is entitled to a rescission of the sale.
Plaintiff-appellant's first and second assignments of error are meritorious. Having decided plaintiff-appellant is entitled to a rescission of the sale, it is not necessary for us to address the third and fourth assignments of error.

EFFECT OF RESCISSION
"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages." C.C. art. 2545.
GMC, a manufacturer, is presumed to know of the defects of the products it makes and, therefore, is deemed to be in bad faith. Rey v. Cuccia, supra at 845. Alexander v. Burroughs Corp., 359 So.2d 607, 609 (La.1978).
The purchase price of the truck was $13,759.00; sales tax, title certificate, registration and license plate ran the total to $14,489.00, of which amount plaintiff paid $4,497.00 as a down payment and financed the remainder, or $9,992.00, with General Motors Acceptance Corporation (GMAC); the total installment price plaintiff obligated himself to pay was $12,192.00; the total purchase price, therefore is $16,689.00. Plaintiff had paid 19 monthly installments through September 30, 1983, totaling $6,008.75, of which amount $2,200.19 represented interest or finance charges, leaving a loan balance of $6,183.25.
The object of the Civil Code provisions governing redhibitory vices is to restore the purchaser, as much as possible, to the condition he enjoyed prior to the sale. Alexander v. Burroughs Corp., supra, at 610.
Plaintiff is entitled to $16,689.00, less the amounts, if any, resulting from the prepayment of the loan, if it has not been paid in full. Plaintiff is also entitled to legal interest on the purchase price from July 14, 1982, the date plaintiff's attorney *1057 directed a letter to John L. Hanks, President of defendant Hanks, in which he tendered the truck to Hanks and demanded rescission of the February 26, 1982 contract because plaintiff's claim was ascertainable on that date when Hanks was put in default; thus legal interest should run from that date rather than from date of judicial demand. Alexander v. Burroughs Corp., supra, at 613 and footnote # 5 thereon.
In assessing attorney's fees which plaintiff is entitled to recover, we have considered the complexity of the facts and legal issues, the considerable effort expended by plaintiff's attorney in responding to GMC's extensive interrogatories and requests for production of documents, participating in deposition hearings, preparing lengthy Pre-Trial and Post-Trial memoranda of law at the Trial Court stage of the proceedings, participating in a two day trial, and preparing his appellate brief. We believe a reasonable fee for plaintiff's attorney's services at the District Court level to be $5,000.00. For services on appeal, we believe $2,000.00 to be a reasonable attorney's fee. Alexander v. Burroughs Corp., 350 So.2d 988, 993 (La.App. 2nd Cir.1977), amended, and as amended, affirmed, 359 So.2d 607, 614 (La.1978). Legal interest on both sums runs from the date of this decision. 359 So.2d at 614.
Regarding credit for use of a redhibitorily defective product, Alexander v. Burroughs Corp., 359 So.2d 607, 610-611 (La.1978), per Dixon, Chief Justice (then Justice), stated the rule succinctly, as follows:
A credit for a purchaser's use of a product may be proper in certain instances, even in favor of a bad faith seller.... Compensation for the buyer's use, however, ought not be granted automatically by the courts; even the value of an extensive use may be overridden by great inconveniences incurred because of the defective nature of the thing and constant interruptions in service caused by the seller's attempts to repair....
The seller who asserts entitlement to a credit for a buyer's use against the sums to which the buyer is entitled as a result of the rescission has the burden of proving the value of the use of the defective product to the buyer. Alexander v. Burroughs Corp., 350 So.2d 988, 993 (La.App. 2d Cir. 1977), amended and affirmed 359 So.2d 607 (La.1978). Hanks not only did not meet the required burden of proof to obtain a credit, it offered nothing to establish the value of the use. We conclude that: the use of the truck by plaintiff in his seafood business was greatly inconvenient and aggravating to him; neither defendant tried to establish the monetary value of the use; neither defendant answered plaintiff's appeal or briefed the issue of their asserted entitlement to credit for use made in the District Court, and, as such, that issue has been abandoned. Having thus concluded, we hold that because there is no evidence in the record to establish the value of the use of the truck by plaintiff, no credit will be allowed.
Plaintiff failed to prove loss of income or expenses allegedly incurred for preserving or storing the vehicle, and his claim fails in that respect. We make the same observation regarding damages for aggravation and inconvenience.

HANKS' THIRD-PARTY DEMAND AGAINST GMC
Hanks' third-party petition alleged that in the event the truck "contained vices and defects ... these vices and defects were caused by and during the manufacturing process by General Motors Corporation" and knowledge of such was unknown to Hanks; therefore, Hanks alleged entitlement to and prayed for "full indemnity from General Motors Corporation for any and all sums which it may be cast in judgment to original plaintiff, together with legal interest, attorneys fees and costs."
Hanks is entitled to full indemnity from GMC, as manufacturer, for any sum Hanks owes plaintiff as a result of the rescission of the sale, including court costs and a reasonable attorney's fee in the *1058 amount of $2,500.00 for services in the District Court and on appeal. Davidson v. New Roads Motor Co., Inc., supra.

DECREE
The judgment of the District Court, dismissing plaintiff's rescission suit and Hanks' third party petition against GMC, is reversed. We grant judgment in favor of the plaintiff and against defendants Hanks and GMC, ordering the rescission of the sale; we further grant judgment in favor of the plaintiff and against the defendants, in solido, in the amount of $16,689.00, plus legal interest from July 14, 1982, less any sums resulting from the prepayment of the truck loan, if any. We grant judgment in favor of plaintiff and against General Motors Corporation in the amount of $7,000.00, plus legal interest thereon from the date of this decision, as attorney's fees. We also grant judgment in favor of Hanks Pontiac-GMC, Inc., third party plaintiff, against General Motors Corporation, third party defendant, for complete legal indemnification for all sums defendant-third party plaintiff owes plaintiff as a result of this judgment rescinding the sale, and an additional amount of $2,500.00 for defendant-third party plaintiff's attorney's fees. All costs, both in the District Court level and on appeal, are cast against General Motors Corporation.
REVERSED AND RENDERED.
LANIER, J., dissents and assigns reasons.
LANIER, Judge, dissenting.
I cannot join in the majority opinion because it fails to apply the manifest error rule properly and it grants redhibition for a truck that traveled almost 60,000 miles in 18½ months, much of which mileage was at or above the truck's recommended load capacity, and the last 39,000+ miles of which were without any repairs.

UNCONTESTED FACTS
On February 26, 1982, Gerald Alleman purchased a 1982 GMC one ton pickup truck from Hanks Pontiac-GMC, Inc. (Hanks) for a price of $14,489, subject to a $750 rebate. The truck had a 6.2 liter, V-8 diesel engine. The vehicle had 500 miles on it at this time. The vehicle had warranties of 12 months or 12,000 miles for material and workmanship and 24 months or 24,000 miles for the power train (engine, transmission, drive train and rear end). The truck had a maximum recommended load capacity (gross weight) of 10,000 pounds. Gross weight is the weight of the truck, driver, fuel, equipment and load. The truck weighed 5,500 pounds.
Alleman did not use the truck for approximately three weeks after he purchased it because he was having a refrigerator box put on it. (Alleman had three other trucks.) The refrigerator box weighed approximately 400 pounds. On or about March 20, 1982, Alleman started using the truck to haul crawfish in his seafood business. The average load hauled in the truck was approximately 4,000 pounds. The maximum load carried was approximately 6,500 pounds.
On April 12, 1982, the truck was brought back to Hanks with complaints of excessive consumption of oil and coolant and a defective left front radio speaker. Hanks removed and replaced both cylinder head gaskets, tightened the engine oil lines and replaced the speaker. Hanks tested the brakes on the truck, and they were normal. Hanks tested the compression on the truck's cylinders, and it was normal. The cost of the work done was $213.15, but Alleman was not charged for it. The mileage on the truck at this time was 3,958. (This shows the truck was driven an average of 150 miles per day during the 23 day period from March 20, 1982, until April 12, 1982.)
The truck was brought back to Hanks on April 28, 1982, because the air-conditioner, power steering and power brakes were not working. Examination revealed the front bearing on the air-conditioning unit failed, causing the belts on the power steering and power brakes to slip. The cost of remedial repairs was $239.29, for which Alleman *1059 was not charged. The mileage on the truck was 11,956. (This shows the truck was driven an average of 500 miles per day during the 16 day period from April 12, 1982, until April 28, 1982.)
On May 10, 1982, Hanks picked up the truck with a wrecker. Examination revealed leaks in the water jacket gasket on the cylinder head and leaks on the radiator hose. The cost of remedial repairs was $50.51, for which Alleman was not charged. The truck apparently remained in the Hanks repair shop until May 12, 1982. On that date, Hanks gave the truck routine maintenance of oil change, grease job and changing of the oil, air and fuel filters. The cost of this work was $110.93, which Alleman paid. The mileage on the truck at this time was 14,185. (This shows the truck was driven an average of 186 miles per day during the 12 day period from April 28, 1982, until May 10, 1982.)
The truck was brought back to Hanks on May 25, 1982, because it was still losing coolant. Examination revealed the upper and lower radiator hoses were leaking and the pinion seal on the differential had an oil leak. The radiator hoses were replaced and coolant replaced at no cost to Alleman. The pinion seal was replaced and oil added at a cost of $47.83 to Alleman. Alleman was billed for the latter because the truck had 16,404 miles on it, more than the 12,000 mile warranty. Alleman refused to pay this bill contending it was covered by the 24,000 mile warranty. (The truck was driven an average of 170 miles per day during the 13 day period from May 12, 1982, until May 25, 1982.)
At an unspecified time prior to June 3, 1982, Alleman wrote a letter of complaint to GMC. By letter dated June 3, 1982, GMC responded to Alleman's letter and advised him that GMC's area service manager would contact him to discuss the matter.
On June 11, 1982, Alleman brought the truck back to Hanks for coolant leaks. Hanks added additional hose clamps to stop the leaks. Remedial costs were $22.10, for which Alleman was not charged. The mileage on the truck at this time was 18,393. (This shows the truck was driven an average of 117 miles per day during the 17 day period from May 25, 1982, until June 11, 1982.)
On June 25, 1982, Alleman brought his truck to Hanks for it to be inspected by David R. Conley, GMC's area service representative. At this time, Alleman complained of excessive coolant usage, an oil leak, poor fuel mileage, defective paint job and pulling brakes. Conley pressure tested the engine, and the result was normal. However, he did observe evidence of a possible coolant leak (a residue) in the head gasket at the rear of the head. The hoses were checked and they had no leaks. Conley also found a slight oil leak above the head at the rear of the valve cover gasket. Conley authorized repairs and asked Alleman to return for them on July 12, 1982.
On July 1, 1982, Alleman brought the truck to Barbera Chevrolet and had the timing of the engine adjusted at a cost of $12.24. The truck had 20,101 miles on it at that time.
The 1982 crawfish season ended for Alleman on July 4, 1982. Alleman did not use this vehicle to deliver crab meat. Alleman did not keep his July 12 appointment for repairs. Alleman contacted an attorney who sent a letter tendering the truck back to Hanks and GMC on or about July 14, 1982. This suit was filed on July 26, 1982.
Alleman began using the truck again during the 1983 crawfish season. Commencing with February 7, 1983, Alleman kept a daily record of the mileage, oil consumption and water usage of the truck. At some point in time, Alleman stopped putting coolant in the vehicle, but the record is unclear as to when this was. Alleman's daily record spans the period of February 7, 1983, to April 22, 1983, and shows the following: (1) total miles traveled were 17,571 (22,181 on February 7 and 39,752 on April 22); (2) 30½ quarts of oil were used and the truck had 3 oil changes; and (3) the truck had water added almost daily. During the 74 day period from February 7, 1983, to April 22, 1983, the vehicle *1060 traveled an average of 237 miles per day. During this period (excluding oil changes), the truck used 1 quart of oil every 576 miles. The daily record does not show how much water was put in the truck on a daily basis.
The truck was inspected again by Conley on September 1, 1983, in preparation for trial. The mileage at that time was 59,395. During the 132 days between April 22, 1983, and September 1, 1983, the truck traveled 19,643 miles or an average of 149 miles per day. The trial of this case was held on October 18, 1983.

CONTESTED FACTSMANIFEST ERROR
The majority held "the District Court committed manifest error in finding the plaintiff failed to prove the existence of a redhibitory defect at the time of the sale" and concludes that "[t]he multiplicity of problems, defects, or vices which beset the truck are redhibitory vices and plaintiff is entitled to a rescission of the sale." To determine if the majority correctly applied the manifest error (clearly wrong) rule for appellate review of facts, a study of the conflicting facts must be made. In the trial court, Alleman had complaints about the truck's (1) paint job, (2) radio speaker, (3) air-conditioner, (4) oil consumption, (5) transmission, (6) coolant and water consumption, (7) fuel consumption and (8) brakes.

Paint Job
On June 25, 1982, for the first time, Alleman complained to the defendants about the paint job on the truck. Conley observed a place on the left side near the back fender of the truck where too much paint had been applied and it appeared to run. In a pretrial deposition, Alleman testified he "noticed it not long after I purchased it, but I wasn't too interested in that defect because it wasn't doing nothing to the performance of the truck or the engine." On June 25, 1982, the 12,000 mile warranty on the paint job had expired.

Radio Speaker
Alleman reported a defective left front speaker to Hanks on April 12, 1982. Hanks replaced it. Alleman testified he started getting static in his radio again at an unspecified time in 1983. Hanks and Conley checked the radio on September 1, 1983, and detected no problem. The trial concluded "[t]his problem was minor, developed long after the sale, and can easily and cheaply be corrected."

Air-conditioner
Alleman brought the truck to Hanks on April 28, 1982, because the air-conditioner front bearing failed. Hanks repaired this defect. Alleman testified he started having trouble with the air-conditioner in about July of 1983. Conley testified he tested the truck's air-conditioner on September 1, 1983, and it worked properly.

Oil Consumption
In deposition on September 1, 1983, Alleman testified that the truck burned a quart of oil every 400 miles. At the trial on October 18, 1983, Alleman testified he burned a quart of oil every 250 miles. Vernon Alleman testified he put in a quart of oil every 200 to 300 miles. Grady Alleman testified he put in a quart of oil every 300 to 400 miles. The daily log kept by Gerald Alleman shows a quart of oil was put in the truck every 576 miles (excluding oil changes). At the trial, Conley was qualified as an expert witness in automotive diagnostic techniques. Conley testified the normal oil usage for this type of truck is one quart for every 400 to 600 miles depending on the amount of the load being carried. The trial court found "[w]ith regard to oil use, plaintiff totally failed to show excessive use." The court observed that "[c]onsidering that plaintiff operated the truck with an average load at its rated capacity and occasionally far exceeded load capacity, David Conley's testimony that the weight of the load affects both oil usage and mileage has particular significance." The trial court concluded "the oil leaks, evidence of which was found, were not shown to have been of such significance as to constitute a redhibitory vice."

*1061 Transmission
Alleman contended the transmission on the truck was hard to shift. Conley tested the transmission on September 1, 1983, and found it operated normally.

Coolant and Water Consumption
Alleman testified coolant and water was added to the truck on a daily basis, but it never overheated. Alleman occasionally added water personally, but usually this was done by others. At an unspecified date, coolant was no longer added and only water was used. Vernon Alleman testified he put in one gallon of coolant every 200 to 300 miles. Vernon stopped putting in collant in May of 1982 and only used water thereafter. Grady Alleman testified he added coolant or water every time he used the truck.
Conley testified he examined the truck on September 1, 1983. He observed evidence of a coolant or water leak between the head and the block. In his deposition, he observed that this leak was probably caused by either a break in the head gasket or a warped head. Either problem was repairable; the gasket or the head could be replaced. Conley put the cooling system on a pressure gauge and confirmed the leak.
The trial court made the following observations about this testimony:
The testimony consisted of broad, general complaints, estimates and exaggerations. Although the truck was used for business purposes, the claims were unsubstantiated by business records. The principal complaints related to loss of coolant and excessive oil use. With regard to the former, the plaintiff made general statements that he was required to add water or coolant every two hundred miles or just about every day. Despite this fact, according to the plaintiff, the truck never overheated. It was never established what ratio of coolant to water was adequate to prevent overheating. Plaintiff never read the owner's manual and apparently was of the opinion that coolant and water were interchangeable. His testimony lacked the consistency and detailed information necessary for the Court to reach a conclusion.

Fuel Consumption
Gerald Alleman testified the truck averaged 10 to 12 miles per gallon and he thought this was low. Vernon Alleman testified the truck averaged about 11 miles per gallon. Conley testified that 10 miles per gallon was normal for the truck if it was operated with a load near capacity. As previously indicated, the trial court accepted Conley's testimony on this issue.

Brakes
Gerald Alleman testified the brakes on the truck pulled to the right. Vernon Alleman testified the brakes pulled to the left. Grady Alleman testified the brakes pulled to the right and that the front brakes worked but the rear brakes did not.
After John Hanks repaired the truck for Alleman on April 12, 1982, he test drove it with a mechanic and detected no braking problem. On September 1, 1983, Conley test drove the truck with John Hanks as a passenger. Conley drove the truck 55 miles per hour and braked heavily. Conley and John Hanks testified they did not find a braking problem.

Manifest Error
It is obvious from the trial court's reasons for judgment that, after observing the appearance and demeanor of the witnesses, it resolved the conflicts in the testimony in favor of the defendants. The majority has reviewed a cold record and has divined in some way that this determination is manifestly erroneous. After reviewing this same cold record, I conclude that the majority has improperly applied the manifest error rule and their factual findings contrary to those of the trial court are clearly wrong.
In particular, the majority erroneously found that the "District Judge imposed a greater burden of proof than required by the jurisprudence" by "requiring plaintiff to have kept a mileage log, complete with oil and coolant usage information ... as a *1062 necessary first step in corroborating his testimony and that of his drivers as to oil and coolant leaked or used". A fair reading of the trial court opinion shows the trial judge considered lack of corroboration as a factor in weighing the evidence and determining credibility; he did not alter the burden or the standard of proof.

REDHIBITION
I cannot agree that a truck which has been operated at or above its load capacity for almost 60,000 miles during an 18½ month period of time has a redhibitory defect.
This court discussed redhibitory defects in Baham v. Community Motors, Inc., 428 So.2d 867, 869-871 (La.App. 1st Cir.1983), as follows:
After examining the record we are convinced the motor home was defective in several aspects. Mr. Baham testified of the myriad problems he experienced with the vehicle. The complaints can be divided into three major categories: interior defects, engine problems, and generator trouble. The interior defects were the most numerous and consisted of problems such as cabinets and doors that would not stay latched, defective armrests and seats, an oven that would not light and problems with the running water. Most of these defects developed within the first few months of ownership. Although some were remedied temporarily, many of the problems reappeared eventually and plaintiff testified they existed at the time of the trial. Plaintiff also complained of the "motor cover" fitting loosely and therefore allowing a great deal of heat to enter the living area of the motor home.
Problems with the engine were also evident from the beginning. On the first repair order Mr. Baham complained of a "roar around the motor" which he stated was never remedied. In August of 1979 he reported the "cruise control" would disengage when he hit the slightest bump in the road. In September of 1979 he complained of the motor "killing." This problem was diagnosed as a shorted wire in the steering column and was repaired. In October of 1979 plaintiff complained the engine was "dying" frequently. In June of 1980 he reported a tapping noise coming from the motor. Shortly thereafter Mr. Baham took the motor home on a trip and complained the engine had stopped about ten times. He was able to get the vehicle back to his home where he left it for approximately six weeks. Since he was unable to start the engine, he finally had the vehicle towed to Community in July of 1980.
Problems with the generator (which powered the air conditioner and refrigerator) began in June of 1980. It would run sometimes and then suddenly cut off. There was some dispute at trial as to whether or not this problem had been corrected. Mr. Baham had testified in a deposition the generator had been repaired; at trial he stated it was still not working dependably.
....
To prevail in an action for redhibition the purchaser must prove the thing sold is "... absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." La.Civil Code art. 2520. Associates Financial Services Co. v. Ryan, 382 So.2d 215 (La.App.3d Cir.1980). After carefully considering the evidence we conclude the vehicle was not so defective as to warrant rescission of the sale.
We reach this conclusion based on several factors. One, the evidence revealed the engine had apparently been repaired and was in good working order at the time of trial. Further, we cannot ignore the fact that at the time the vehicle was tendered to Community Motors it was fifteen months old and had more than 7,400 miles on it. It is also of some significance the first and only complaint concerning the generator was made after it had been used for a year and two months. These factors convince us the trial court's judgment, *1063 whether it intended a rescission or not, was erroneous.
In a redhibition suit, the plaintiff may limit his demand for a reduction of price, when the defect in the thing is "... such as merely to diminish the value...." See La.Civil Code art. 2541. Likewise, the judge has the discretion to decree a reduction of price in any redhibitory action. Art. 2543. The evidence established the motor home was in fact diminished in value due to the numerous defects and was obviously of much lesser quality than one would expect of a $23,000 vehicle.
[Underscoring added].
[Footnotes omitted].
The truck herein was operated from July 1, 1982, until September 1, 1983, without repairs. The distance covered during this time was 39,294 miles, an average of 2,807 miles per month. During a portion of the 1983 crawfish season, it was driven at or above load capacity for 74 days at 237 miles per day. Obviously, the vehicle (even if it had a defect) was not absolutely useless. Further, if its use was imperfect or inconvenient, it could not have survived such use in Alleman's business, and/or Alleman would not have relied on it that much for business purposes. On September 1, 1983, the truck had been driven 59,395 miles. Redhibition has been denied where vehicle use was substantially less. Nelkin v. Piotrowski, 448 So.2d 173 (La. App. 5th Cir.1984) (25,000 miles); Boudreaux v. Riley Buick, Inc., 415 So.2d 970 (La.App. 2nd Cir.1982), writ granted, 420 So.2d 166 (La.1982) (11,000 miles); Ashley v. Volkswagen of America, Inc., 380 So.2d 702 (La.App. 4th Cir.1980) (35,000 miles); Menville v. Stephens Chevrolet, Inc., 300 So.2d 858 (La.App. 3rd Cir.1974), writ denied, 303 So.2d 186 (La.1974) (48,000 miles). If the defects in the Baham case did not justify redhibition, then, by analogy, any defects in the instant case do not support redhibition. See also Chalmers v. Stephens Chevrolet, Inc., 461 So.2d 395 (La. App. 4th Cir.1984); Dickerson v. Begnaud Motors, Inc., 446 So.2d 536 (La.App. 3rd Cir.1984), writ denied, 449 So.2d 1349 (La. 1984).
For the foregoing reasons, I respectfully dissent.