492 So.2d 132 (1986)
George DREHER, III
v.
HOOD MOTOR COMPANY, INC., et al.
No. 85 CA 0647.
Court of Appeal of Louisiana, First Circuit.
June 24, 1986.
*133 Teddy Airhart, Jr., Baton Rouge, for plaintiff-appellant.
Charles Reid, Amite, for defendant-appellee Hood Motor Co.
Charles Genco, Amite, for G.M.A.C. defendant-appellee.
Nita Gorrell, Hammond, for defendant-appellee G.M.C.
Before LOTTINGER, CRAIN and PONDER[*], JJ.
CRAIN, Judge.
This is an automobile redhibition case. The plaintiff, George Dreher, III, sued Hood Motor Company Inc. (Hood), General Motors Corporation (G.M.) and General Motors Acceptance Corporation[1] alleging that *134 certain defects in a new Chevrolet truck he had purchased from Hood entitled him to have the sale rescinded. The trial court rendered judgment in favor of all defendants after finding that any defects that existed had been timely repaired. Plaintiff appeals and we reverse.

FACTS
On November 8, 1982, Dreher purchased from Hood a new 1983 Chevrolet S-10 truck manufactured by G.M. The truck had a V-6 engine, four-wheel drive and an extended cab. The total cash price including tax and license was $13,101.57. With approximately 8500 miles on the truck, Dreher brought it to Hood on June 10, 1983, when he heard a loud knocking noise in the engine. He also reported problems with the clutch and the transmission.
The clutch mechanism was examined and some of the pressure plate fingers were found to be warped and bent, necessitating replacement of the plate. The engine crankshaft journals were found to be eggshaped and so evenly worn that they appeared to have been machined down. The crankshaft bearings were also found to be badly worn. After authorization from G.M., Hood replaced the crankshaft with a new one.
As the truck was still under its original new vehicle warranty, all repairs were made free of charge, despite the fact that Hood suspected owner neglect and abuse had caused the failure. Hood found the engine compartment caked with mud. It also found sand and dirt on the inside of the air filter housing, leading Hood and G.M. to suspect foreign material had entered the engine and caused the abnormal wear. Hood's employees also noted a "gritty" substance in the engine oil.
Hood kept Dreher's truck for two weeks while replacing the crankshaft. Despite this repair, Dreher's problems with the truck continued. The noise in the engine was still present and he also heard a noise in either the transmission or the clutch.
Moreover, he experienced several new problems: noise in the rear-end differential, the front-wheel drive mechanism not engaging, wiring harnesses in the engine compartment left disconnected, and improperly adjusted pedals and sloppy interior trim work. Dreher also claimed excessive oil consumption, one quart every 150 miles. He brought the vehicle back to Hood.
On this occasion Hood found "piston slap" and decided to replace the entire engine "short block" along with the oil pump, timing chain and sprocket. Hood again replaced the clutch pressure plate, this time with a new and modified plate in accordance with a recall notice G.M. had issued with reference to the problems of clutch chatter.
Piston slap occurs when excessive tolerance exists between the piston and the cylinder walls, causing the piston to slap unevenly against the cylinder wall, instead of moving uniformly up and down. An engine "short block" consists of the entire lower portion of the engine and its internal components, including the lower block, crankshaft and pistons. The component parts from the upper half of the old engine including valves, manifolds, carburetor, and water pump were not replaced with new parts but rather were attached to the new short block. It took Hood over one month to make these repairs. In the meantime, Dreher purchased a used 1976 Pontiac for $1000 from another dealer in order to have transportation while his truck was at Hood's.
When the truck was returned to Dreher the clutch was still not operating properly. Unusual noises were still emanating from the engine, transmission and differentials; oil consumption problems remained. Hood informed Dreher that he should take the truck to another Chevrolet dealership located closer to Dreher's residence in order to have them check for excessive oil consumption. Dreher decided instead to leave the truck at Hood's place of business, and this lawsuit ensued.
*135 At trial, lengthy testimony was presented by both sides as to what may have been the cause of the engine problems. The issue was whether a latent defect existed in the engine or whether owner abuse and neglect had caused the failure.
The trial judge did not make an express factual finding as to the cause of the engine problems. He did however, conclude that the defendants had failed to prove any abuse or negligent maintenance by Dreher. Instead he found that the vehicle was properly maintained and used in its normal and intended manner. However, the trial judge refused to rescind the sale or grant plaintiff any damages. He found that plaintiff had failed to prove that the vehicle was not properly repaired by Hood. He therefore concluded that the cause of the problem was irrelevant. He further found that no notice or opportunity to repair was given to the defendants of the other problems (e.g. oil consumption and four wheel drive not engaging). He concluded that plaintiff was not entitled to an action in redhibition and the suit was dismissed.

REDHIBITION
We find that the court erred in regard to the applicable legal principles involving redhibition. There is a clear distinction, both statutory and jurisprudential, between the manufacturer of a product and the seller of the product in regard to their respective rights and obligations to a purchaser.
In a redhibitory action, a seller of a thing, who has no actual or constructive knowledge of the thing's vice or defect is in good faith. La.C.C. art. 2531. Before a purchaser can institute an action to rescind a sale, a good faith seller must be given some opportunity to remedy the defect. Coleman Oldsmobile v. Newman & Associates, 477 So.2d 1155 (La.App. 1st Cir. 1985).
In contrast, the manufacturer of the vehicle is conclusively presumed to know of the defects and is considered to be in bad faith. Rey v. Cuccia, 298 So.2d 840 (La. 1974); Dickerson v. Begnaud Motors, Inc., 446 So.2d 536 (La.App. 3d Cir.1984), writ denied 449 So.2d 1349 (La.1984). A manufacturer is not entitled to notice, tender, or opportunity to repair. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La. 1973); Burns v. Lamar-Lane Chevrolet, Inc., 354 So.2d 620 (La.App. 1st Cir.1977); Dickerson, 446 So.2d 536; Moran v. Robertson Corp., 372 So.2d 758 (La.App. 4th Cir.1979). The trial court erred in holding otherwise.
General Motors contends that the above cited cases are not applicable to this case because in the instant case repairs were actually made and no redhibitory defect was actually found to exist.
We find this contention to be without merit. The trial court made no finding that a redhibitory vice did or did not exist. Further, assuming that redhibitory defects did exist, attempts at repair, whether successful or not, are immaterial in regard to the manufacturer. See Dickerson, 446 So.2d 536; Cox v. Moore, 367 So.2d 424 (La.App. 2nd Cir.1979), writ denied 369 So.2d 1364 (La.1979). The essence of an action in redhibition, at least as to a manufacturer, is to have the sale rescinded, not to merely have defects remedied.[2] Additionally, the jurisprudence is replete with cases holding that numerous defects, even though many are minor and have been repaired, can be grounds for rescission. Alleman v. Hanks Pontiac-GMC, Inc., 483 So.2d 1050 (La.App. 1st Cir.1985); Wheeler v. Clearview Dodge Sales, 462 So.2d 1298 (La.App. 5th Cir. 1985); Chalmers v. Stephens Chevrolet, Inc., 461 So.2d 395 (La.App. 4th Cir.1984); Cangelosi v. McInnis Peterson Chevrolet, Inc., 373 So.2d 1346 (La.App. 1st Cir.1979). Otherwise, rescission could be avoided altogether by continually repairing the vehicle *136 no matter how major or numerous the defects.
Accordingly, the central issue in this case is whether or not the vices or defects in the truck entitled plaintiff to rescind the sale, without regard to repair attempts.
The trial court did not make the proper determination as to the effect of the vices. Having the complete record before us, and finding that a remand of this case is not in the interest of judicial economy, we will decide the issue on this appeal. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Efferson v. State, Through Dept. of T. & Dev., 463 So.2d 1342 (La.App. 1st Cir.1984), writ denied, 465 So.2d 722 (La.1985).

RESCISSION OF THE SALE
La.C.C. art. 2520 provides that:

Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.
In addition to proving that the vices were of such a quality that the purchaser would not have made the purchase, the purchaser must also prove that the nonapparent defects existed at the time of sale. La.C.C. art. 2530. After thoroughly reviewing all of the evidence and testimony presented, we conclude that plaintiff proved by a preponderance of the evidence that the engine contained a latent defect or vice, most probably a "soft" and/or undersized crankshaft, and that this vice pre-existed the sale.
Both sides agreed that the engine's problems arose as a result of abnormal internal wear. General Motors tried to establish that this was caused by Dreher's misuse or abuse in allowing sand and/or dirt to enter the engine. Their theory was that the truck had been driven through a deep, muddy, river bank. The trial court rejected this defense, and we cannot say this factual conclusion was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Testimony indicated that while it was normal for a four wheel drive truck to have sand and dirt inside the air filter unit, there seemed to be an excessive buildup in this truck. However, G.M. was unable to refute plaintiff's testimony that no matter how great the intrusion of foreign matter into the housing, the material would only be able to penetrate through the air filter by eventually so clogging it up that the element itself would tear open. Also, testimony indicated that if entry was gained through the carburetor, then unlike the instant case, most of the damage would have occurred in the upper half of the engine, damaging the cylinder walls, valves, piston rings and heads, rather than lower in the engine where the oil sump and filter would have trapped the particles before significant damage occurred.
Most importantly, the evidence indicated that the bearings, which are made of a softer material than the crankshaft, had much less wear on them than the crankshaft itself. This tended to discount the foreign material theory, as any such abrasive should have worn out the presumably softer bearings before the harder crankshaft. Instead, it tended to prove that the crankshaft itself was materially flawed. As it deteriorated over time, damage was continuously being done in the lower portion of the engine. New material was constantly grinding off and being introduced, causing damage before it could be filtered out. Defendant's mechanics who had worked on the engine all testified that the oil was filled with a fine grit. However, defendants did not have this grit tested to determine if any sand, dirt or other foreign material was in the oil. At least one of the mechanics testified that this grit was composed mostly of fine metal shavings. These metal particles were likely shavings from the crankshaft as it continually wore itself down, and then the rest of the engine. Additionally, one of G.M.'s own mechanics volunteered his opinion on cross-examination that the alleged foreign material *137 had not entered through the air filter.[3] Considering this evidence, we conclude that plaintiff proved more likely than not, that a soft or undersized crankshaft caused the problem. In the ordinary course of usage, crankshafts do not fail within 8,500 miles. The crankshaft contained a manufacturing defect, either in material or fabrication which existed before the sale. See Moreno's, Inc. v. Lake Charles Catholic H. Schs., Inc., 315 So.2d 660 (La.1975).
Having found that the product contained a vice or a defect that pre-existed the sale, we now turn to a consideration of whether plaintiff is entitled to rescission. We have no trouble in concluding that the defects in the truck rendered it so inconvenient and imperfect that the sale should be rescinded. La.C.C. art. 2520.
This truck was obviously plagued with major mechanical difficulties rendering it unfit for its intended use. Additionally, Dreher was without the use of his truck for at least six weeks, and experienced substandard performance for a significant period of time when it was in use. Dreher was not provided with a substitute vehicle during this period, forcing him to seek alternative transportation at his expense. The defective engine alone would probably justify this determination, but our decision is also based on the continuing repair problems with the clutch and transmission.[4] We conclude that Dreher has proven that if he had known of the difficulties he would experience with this truck, he would not have purchased it. La.C.C. art. 2520. Accordingly, plaintiff is entitled to a rescission of the sale.

HOOD MOTOR COMPANY
Having no actual or constructive knowledge of the defects, Hood Motors is a good faith seller as defined in La.C.C. art. 2531. We have previously stated that "In a continuing line of jurisprudence this court has held that the seller should be given the opportunity to repair the defects before the purchaser may commence an action to rescind the sale." Coleman, 477 So.2d at 1158.
The trial court made a factual determination that Hood repaired the problems caused by the faulty crankshaft. However, the inquiry in regard to Hood's potential liability does not end upon finding that repairs were eventually completed. La.C.C. art. 2531 provides that a good faith seller is bound to repair, remedy or correct the vices. If he fails or is unable to do so, then he is liable to the purchaser. But, article 2531 does not provide any standards or guidelines for determining at what point the seller is no longer legally able to repair or remedy the vice and avoid redhibition. Jordan v. LeBlanc and Broussard Ford, Inc., 332 So.2d 534 (La.App. 3rd Cir.1976). The question then becomes, as concisely put by our brethren in the Third Circuit, "When does the vendor's right to repair end and the vendee's right to rescission begin?" Dickerson, 446 So.2d at 539. We agree with the conclusion in Dickerson that a good faith seller is to be afforded a reasonable opportunity to repair the defect, considering the particular circumstances of the case. Some of the factors the court considered in Dickerson were whether or not the buyer had been furnished substitute transportation, the extent to which the buyer's lifestyle was disrupted by the unavailability of the vehicle, the nature of the defect, difficulty of remedy and the number of unsuccessful repair attempts.
We also find guidance in the recently adopted Motor Vehicle Warranties Statutes, La.R.S. 51:1941 et seq., wherein the legislature has determined that if a vehicle is out of service by reason of repair for a cumulative total of thirty or more *138 days, a presumption applies that a reasonable number of attempts have been undertaken to repair the vehicle. The purchaser is then entitled to a new vehicle or a refund of the purchase price. See La.R.S. 51:1943-44. However, we emphasize that this 30 day test is not being looked to as a hard and fast rule to adopt under La.C.C. art. 2531. We hold that it is merely one of many permissible factors to use as a guideline in determining what constitutes a good faith seller's reasonable opportunity to repair.
Applying these guidelines to the facts of this case we find Hood's right to repair had ended because of the following: Dreher was significantly inconvenienced by having to obtain substitute transportation; the loss of use of his four-wheel drive truck undoubtedly interrupted his lifestyle, as the particular attributes of such a vehicle, i.e., off-road use, are not available from standard transportation; while the nature of the defects were significant, they were readily diagnosed. The repairs themselves were fairly straightforward, but several repair attempts were necessary and entailed a great amount of time; the truck was out of service for a cumulative total of days well in excess of 30 days. Finally, Hood admitted that the repair work performed was sloppy; loose screws, wires, hoses and improper adjustments abounded. In fact, the truck was returned to Dreher in significantly worse shape (disregarding the engine repairs) than when it was originally tendered. We have little difficulty in concluding that under the circumstances Hood's reasonable opportunity to repair had ended, entitling Dreher to rescind the sale as to Hood.

DAMAGES
Dreher is entitled to a return of the purchase price in the amount of $12,758.75, plus sales tax of $311.32, license and title fees of $31.50, and $6,170.78 for finance and interest charges. G.M. is liable for $750 for loss of use of the truck.[5] Furthermore, plaintiff's attorney's fees are set at $3,500 for trial and $750 for this appeal against G.M. Defendants are entitled to the credits arising from cancellation of credit life insurance and prepayment of the balance of the note, if any. Additionally, they are entitled to a credit for plaintiff's use of the vehicle for the 9 months and 8,500 miles prior to the defects having manifested themselves. Testimony was given that the vehicle was valued at a retail price of $8,500 in October of 1984, down from a retail price of $12,000 in November, 1982. This represents a decline in value of $3,500 in 23 months or $152 a month. Dreher drove the vehicle for approximately 8 months without experiencing problems. A reasonable assessment of the value of the credit for the vehicle's use would be $1,368 (8 mos. at $152 a month). Dreher is entitled to be reimbursed for G.M.'s use of his $3,000 downpayment money for 1 year (date of judicial demand) at the legal rate of 12 per cent per annum. La.C.C. art. 2924, Coleman, 477 So.2d at 1160.

HOOD'S THIRD-PARTY DEMAND AGAINST G.M.
In its third party demand against G.M., Hood alleged that it was entitled to indemnity from G.M. for any amounts it may be cast in judgment, as well as attorney's fees. The trial court dismissed the claims of plaintiff, and consequently had no reason to rule on the third-party demand. Our reversal of the trial court's judgment dismissing defendant Hood, now places its third-party demand against G.M. squarely at issue. Despite the fact that Hood neither appealed nor answered the appeal, prior jurisprudence places the third-party demand before us. Versai Management v. Monticello Forest, 479 So.2d 477 (La.App. 1st Cir.1985); Robertson v. Parish of East Baton Rouge, 415 So.2d 365 (La.App. 1st Cir.1982).
*139 In order for a good-faith seller to be denied indemnity, the burden is upon the manufacturer to prove its defense that the defects triggering redhibition were easily remediable. Cefalu v. Leon Pickard Chevrolet, Inc., 428 So.2d 1063 (La.App. 1st Cir.1983); Leonard v. Daigle Pontiac-Buick-GMC, Inc., 413 So.2d 577 (La.App. 1st Cir.1982). G.M. introduced little or no evidence to prove this defense and failed to meet its burden. Consequently, Hood is entitled to full indemnity as requested pursuant to La.C.C. art. 2531. We set attorney's fees for services in the district court at $2,000.

DECREE
In accordance with the above and foregoing opinion, the decision of the trial court in favor of Hood and General Motors is reversed. Judgment is granted in favor of plaintiff and against General Motors Corporation and Hood Motor Company, Inc., rescinding the sale.
Judgment is further rendered against Hood and General Motors in solido, in the sum of $19,272.35 plus 12 per cent per annum interest on $3,000 for one year, less $1,368 for plaintiff's use of the vehicle and any prepayment credits.
Judgment is rendered against General Motors in favor of Dreher in the amount of $750 for loss of use of the truck and attorney's fees of $4,250. Judgment is further rendered in favor of Hood and against General Motors for full indemnification of all sums Hood owes plaintiff as a result of this judgment, and for $2,000 in attorney's fees Hood incurred defending this suit. All sums are rendered with legal interest from date of judicial demand until paid. General Motors is cast for all costs.
REVERSED AND RENDERED.
NOTES
[*] Judge Elven E. Ponder, Retired, has been assigned temporarily to this court by the Supreme Court of Louisiana to fill the vacancy created by the election of Justice Luther F. Cole to the Supreme Court.
[1] The plaintiff was initially granted a preliminary injunction against G.M.A.C. enjoining it from collection of the monthly payment under the note and chattel mortgage.
[2] Although under certain circumstances, a reduction in price may be more appropriate. La. C.C. art. 2541.
[3] Dirt could have entered the engine either through the crankcase ventilation tube or the engine oil dipstick tube. However, there was absolutely no evidence presented to show that the engine was contaminated through either of these routes.
[4] The question of notice of these problems to G.M. is immaterial. Additionally, Dreher testified at trial to transmission problems and other difficulties without a contemporaneous objection by defendants being made.
[5] Plaintiff is not entitled to be reimbursed for the purchase price of the replacement vehicle he purchased. He is only entitled to the value of the loss of use of his truck, which we find to be $750.